## No. 3047.

### George C. Clore *v.* The State.

1. Manslaughter—"Adequate Cause"—Charge of the Court.—Man-slaughter, under our law, is predicated upon adequate cause, and unless adequate cause exists the homicide will not be reduced from murder though committed under the immediate influence of sudden passion rendering the mind incapable of cool reflection. See the statement of the case for evidence *held* not to demand of the trial court a charge upon manslaughter, because it clearly demonstrates the non-existence of adequate cause.

2. Same—Murder—Intoxication as a Defense to Crime—Statutes Construed.—The meaning of our statute regulating intoxication as a defense to crime is, 1, Mere intoxication from the recent use of ardent spirits will not, of itself, in any case excuse crime. 2, Mere intoxication will neither mitigate the degree nor the penalty of crime. 3, Temporary insanity produced by such use of ardent spirits is evidence which may be used in all cases in the mitigation of the penalty, and also in murder, for the further purpose of determining the degree. (Willson's Crim. Stats., sec. 92.) In this case the charge of the trial court on the subject (for which see the opinion) was favorable to the defendant, and his objection to the same will not be heard on appeal.

3. Same—Circumstantial Evidence—Practice.—The trial court is not required to instruct the jury on the law of circumstantial evidence unless the inculpatory evidence is altogether of that character,—which was not the condition of the proof in this case.

4. Same—Continuance.—Continuance to procure absent testimony that does not appear to be either material or probably true, or which, if present, would be inadmissible, is properly refused.

Appeal from the District Court of Hopkins. Tried below before the Hon. J. A. B. Putman.

This conviction was in the second degree for the murder of
J. M. Garrett, the penalty assessed against the appellant being
a term of thirty years in the penitentiary.

John Armstrong was the first witness for the State. He tes-
tified that on the third day of October, 1888, he and the de-
ceased, the defendant, and P. H. and Bud Williams, went to-
gether to the town of Sulphur Springs, in Hopkins county, all
riding in the wagon of the defendant. They started home in
the same wagon late in the evening, defendant and deceased
occupying the front seat, defendant driving, witness and P. H.
Williams occupying a rear seat, and Bud Williams lying down,
drunk, in the bed of the wagon. Defendant and deceased got
into a quarrel about a rail transaction that occurred about four
years before. They cursed and abused each other until a point
about eleven miles from Sulphur Springs was reached, when
they stopped the wagon, got out, and continued their quarrel in
the road. About that time a wagon in which were W. B. Ratliff
and Jeff Garrett, the brother of deceased, drove up and stopped.
Ratliff got out and persuaded defendant and deceased to stop
the quarrel and go home. A drink was taken by all parties.
Witness got into Ratliff's wagon and requested the deceased to
do the same, but defendant said to him: "Get into my wagon
and let's go home," and deceased got back into that wagon. It
was then quite dark. Ratliff drove his wagon on in advance,
defendant's wagon following about thirty steps behind. Within
a short time the witness heard the defendant and deceased again
cursing each other. P. H. Williams soon called to Ratliff that
defendant and deceased were fighting. Ratliff stopped his
wagon, and he and witness got out and went back towards de-
fendant's wagon. Ratliff went at once to defendant's wagon
bed, and instantly called to Jeff Garrett: "Cut out a horse and
go for the doctor; George has killed Jim Marion." Defendant
then went towards Ratliff and Ratliff retreated. The witness
then went to the front of the wagon bed, and saw the deceased
lying in it, dead. Defendant, who by that time had unhitched
one of the horses, said that he had killed Jim Marion and had
to leave. He then led his horse to the side of the wagon bed,
but witness could not see what he next did. He then got on his
horse and left.

Cross examined, the witness said that he had drank some
whisky, but was not drunk. Defendant and deceased were

both drinking, but witness did not consider either· of them intoxicated. P. H. Williams did not drink much, but Bud Williams got drunk and was asleep in the wagon when the cutting occurred. While unhitching his horse the defendant said that he had killed Jim Marion; that he would not have done it for the world, and that he had to leave. Witness thought that defendant was then crying, but it was too dark to see.

P. H. Williams testified, for the State, substantially as did the witness Armstrong up to the time when defendant and deceased got back into the wagon. They then appeared friendly, but presently they got to quarreling again, cursing and abusing each other. After a short interval defendant said: "I will not take it any longer." The witness then heard the thud of a blow and the escape of blood, and about that time the deceased fell face down, in the wagon bed and expired. Witness at once seized the lines and called to Ratliff to come back, as defendant and deceased were fighting. Defendant then sprang out of the wagon and began to unhitch one of the horses, remarking: "I have killed Jim Marion, and have to leave." Witness then went to the head of the team and defendant called to him: "Williams, be kind to the widow and orphans." He then rode up to the wagon where the deceased was, and got down, but, as it was quite dark, witness did not see what he did, if anything. He then got on his horse and rode off. When speaking to witness just after the killing, the defendant appeared to be greatly distressed. He said he would not have done it for the world, but did not say that he had killed him, or that deceased was cutting at him with a knife. Defendant and deceased were both drinking, but the witness did not think that either of them was drunk. Defendant's wife was the sister of the deceased.

W. B. Ratliff was the next witness for the State. His narrative relates to the occurrences after he found the parties in the road engaged in the first quarrel, and concurs with that of the previous witnesses. In addition to the facts stated by Armstrong, he said that, when he hallooed to Jeff Garrett that defendant had killed Jim Marion, the defendant, with something in his hand which glistened like a knife blade, rushed at him and said: "Yes, and G—d d—n you, I will kill you too!" He struck at witness twice with the object he had in his hand. Deceased's throat was cut in two places, and he was stabbed twice in the breast. Defendant was very much excited, and acted like he was drunk. He was then wearing the suit of

clothes he had on at this trial. If there was a cut in the coat when he left town on that evening, witness did not know it.

State's witness Johnson testified that, after the killing, he saw an open pocket knife in one of the pockets of deceased's trowsers, the blade protruding from the pocket. Two days after the homicide, the witness found defendant in Kaufman county under arrest. His coat then had cuts in it which looked like knife cuts. Defendant, speaking about those cuts, said that he did not know how they were made, and did not know they had been made until the morning after the killing.

The State closed.

Jeff Garrett, the brother of the deceased, was the only witness for the defense. He testified that defendant and deceased had a quarrel about some rails about four years before the killing, but "made it up," and from that time until the tragedy had been on terms of great intimacy with each other. Immediately after the killing, the defendant, weeping and much distressed and excited, said that he would not have killed the deceased for the world. Witness knew that the knife found open in deceased's pocket belonged to the deceased. Defendant's coat was not cut when he left Sulphur Springs on the fatal evening.

The defense introduced the coat in evidence and closed.

The opinion states the substance of the proposed testimony of Mrs. Clore, set out in the motion for continuance. The said motion alleged also that the absent witness, Deacon, would testify that, some time prior to the fatal day, deceased said that he intended to kill defendant, which threat he communicated to defendant.

*King & Whittle*, for appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. It is urgently insisted that the court erred in refusing to give the special instructions requested by defendant upon manslaughter, and in failing to submit in his charge the issue of manslaughter.

"Manslaughter is predicated upon adequate cause, and unless adequate cause exists, the homicide will not be reduced from murder although it was committed under the immediate influence of sudden passion rendering the mind incapable of cool reflection." (McKinney v. The State, 8 Texas Ct. App., 626;

Hill v. The State, 11 Texas Ct. App., 456; Neyland v. The State, 13 Texas Ct. App., 536; Willson's Crim. Stats., sec. 1018.)

In our opinion there is no evidence in this case tending to show adequate cause. Defendant and deceased had had a previous quarrel just a few moments before, but that had been amicably settled. Defendant invited deceased to get back into his wagon, and, in the language of one of the witnesses, "they appeared friendly when they got back into the wagon." No one knows what occasioned or who commenced the second altercation. P. H. Williams, who was in the wagon with them, says: "Directly, they commenced quarreling and cursing. They stopped for a little bit, and then I heard the defendant Clore say, 'I will not take it any longer,' and I heard the thud of a blow, and I heard the blood gushing out, and deceased pitched forward face downward in the front part of the wagon and expired. He never spoke or made a noise." In the first difficulty the parties did not come to blows.

If in the second difficulty the deceased simply cursed defendant, such conduct would not be adequate cause. (Penal Code, art. 597.) Defendant never claimed that deceased had inflicted pain or bloodshed upon him, and no injuries or bruises appeared upon his person. When arrested, two days afterwards, several cuts were found in his coat, as though they had been made with a knife, but he himself said that "he never knew that his coat was cut until the morning after the killing." It is singular that none of these cuts penetrated deep enough to touch or leave the slightest mark upon the person of defendant. As to these cuts the charge of the court was amply sufficient upon the law of self defense.

From our view of the evidence we concur in opinion with the learned trial judge that there was no manslaughter in the case, no adequate cause being shown.

It is contended that the court erred in its charge to the jury upon the defense of intoxication as raised by the evidence. That portion of the charge was as follows: "The jury are charged that intoxication produced by voluntary recent use of ardent spirits constitutes no excuse for the commission of crime, nor does intoxication mitigate either the degree or the penalty of the crime. However, in a case where the defendant is accused of murder, as in this case, the jury may take into consideration the mental condition of the defendant, for the purpose of determining the degree of murder, if the jury should find

the defendant guilty of murder under the evidence and the law as given them in charge." This instruction is in almost the exact language of an instruction held by us to be correct in Charles v. The State, 13 Texas Court of Appeals, 658.

Counsel for appellant cite us to Williams v. The State, 25 Texas Court of Appeals, 76. It occurs to us that there is a general misapprehension of the meaning of the language used in the statute regulating intoxication as a defense to crime. (General Laws, Seventeenth Legislature, regular session, page 9.) We copy the statute as found in Willson's Criminal Statutes, section 92. It reads: "Section 1. Neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits shall constitute any excuse in this State for the commission of crime, nor shall *intoxication* mitigate either the degree or the penalty of crime; but evidence of *temporary insanity* produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried, and in cases of murder for the purpose of determining the degree of murder of which the defendant may be found guilty of murder.

"Section 2. It shall be the duty of the several district and county judges of this State, in criminal prosecutions pending before them where *temporary insanity* is relied upon as a defense and the evidence tends to show that such *insanity* is brought about by the inordinate use of intoxicating liquors, to charge the jury in accordance with the provisions of section one of this act." (Penal Code, art. 40*a*; Willson's Crim. Stats., sec. 92.)

We think it clear that the legislative intention was, first, that mere *intoxication* from the recent use of ardent spirits should not of itself in any case excuse crime. Second. That mere *intoxication* should neither mitigate the degree nor the penalty of crime. Third. *Temporary insanity* produced by such use of ardent spirits is evidence which may be used in all cases in the mitigation of the penalty, and also in murder, for the further purpose of determining the degree. Of itself *intoxication* is neither a justification, mitigation, nor excuse of any sort for crime. It must go to the extent of producing *temporary insanity* before it will be allowed to mitigate the penalty, and in murder before it can be considered in determining the degree. This is our understanding of the proper construc-

tion to be placed upon the language of the statute. In the case in hand, the instruction complained of is more favorable than the statute, because the court did not limit and restrict the jury to *temporary insanity,* but allowed them to take into consideration his mental condition, whatever it might be, in so determining the degree of murder of which he was guilty. We can not conceive that defendant has any just ground of complaint at the charge.

It was contended that the court should have charged upon the law of circumstantial evidence. This was not a case of that character. That defendant, and he alone, killed deceased, there can not be the shadow of a doubt. The testimony is as positive to the fact as it could well be. Defendant himself said: "I have killed Jim Marion Garrett, and have to leave."

Without discussing the other several supposed errors with regard to the charge, suffice it to say that in our opinion it was a full and sufficient exposition of the law applicable to all the legitimate phases of the evidence, and we can perceive no error in the refusal of the special requested instructions.

Appellant's first bill of exceptions was saved to the action of the court in overruling his application for continuance. As to the proposed testimony of the absent witness Deacon, it appears to us to be neither material nor probably true. By the witness Mollie Clore, defendant's wife, he expected to prove that when he got to his house, a short while after the killing, he was excited, and his clothing was freshly cut, showing the appearance of knife cuts; that he told her of the killing—that he was forced to do it, and deceased was trying to kill him and was cutting at him, and had cut his clothing several times before he, defendant, cut deceased. It is in evidence that defendant's house was two and a half or three miles from the place of the homicide. With reference to the cuts in his coat, the statement as to what his wife would swear does not tally with defendant's own statement to Johnson, the constable, who pursued and arrested him two days afterwards in Kaufman county. He told Johnson "he didn't know when the cuts were made; that he never knew his coat was cut till the morning after the killing." Under these circumstances we think we would be fully warranted in the conclusion that the proposed testimony as to the cuts in the coat would not probably be true, though it might be admissible as evidence. (Good v. The State, 18 Texas Ct. App., 39.) His statements to his wife, however,

would not be admissible. "Such declarations were not part of the res gestæ and come within the category of self serving declarations." (Good v. The State, supra; West v. The State, 7 Texas Ct. App., 150; Caldwell v. The State, 12 Texas Ct. App., 302; 48 Ga., 607; Hobbs v. The State, 16 Texas Ct. App., 517.) No error is perceived in the action of the court in reference to the motion for a continuance.

Other errors assigned are not maintainable and will not be discussed; we have found none such as would require a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*