THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM CONNORS *et al.* Plaintiffs in Error.

*Opinion filed February 23, 1912.*

1. CRIMINAL LAW—*specific intent is the gist of charge of assault with intent to murder.* In a prosecution for an assault with intent to murder or with intent to commit some other felony, the specific intent charged is the gist of the offense and must be proved as alleged.

2. SAME—*an intent to kill is specific though in the alternative.* An assault to murder may be complete where it is shown that the assailant, with the present ability to destroy life or do great bodily harm, draws a dangerous weapon on another and threatens to kill him if he does not immediately comply with some unlawful condition or demand.

3. SAME—*when an assault with intent to murder is complete.* The fact that the assailant, who has presented a deadly weapon and threatened to kill another if the latter does not comply with an unlawful demand, suspends his purpose to give the victim an opportunity to comply with such demand, does not prevent the offense of assault with intent to kill from being complete.

4. SAME—*when guilt must be determined the same as though the threat to kill was not accompanied by any demand.* Where a violent assault with a dangerous and deadly weapon is made upon a person in the peace of the people and a threat to destroy his life is made unless he complies with an unlawful demand, the guilt or innocence of the assailant must be determined precisely as though no unlawful demand had been made.

5. SAME—*when evidence of conversations with persons other than defendants is admissible.* In a prosecution against members of a labor union for an assault with intent to murder the prosecuting witness in an attack upon members of another labor union to which the prosecuting witness belonged, if the evidence fairly tends to show that certain persons other than the defendants were members of the attacking party, it is not error to allow the prosecuting witness to testify that such persons, a few days before the attack occurred, had visited the place where the attack was made, and he may testify as to what was then said concerning the matter of his membership in the union.

6. SAME—*when a conviction will be sustained notwithstanding evidence tending to establish an alibi.* A conviction for assault

with intent to murder will be sustained even though there is evidence tending to establish an alibi as to one of the defendants, where such evidence is controverted and the verdict is not clearly contrary to the weight of the evidence upon such matter.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

DANIEL L. CRUICE, A. S. LANGILLE, O. J. C. WRAY, and CHARLES E. ERBSTEIN, for plaintiffs in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JOHN E. NORTHUP, and ROBERT E. CROWE, of counsel,) for the People.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Plaintiffs in error, William Connors, Peter Gentleman, Arthur O'Connor and Edward Storgaard, were jointly indicted, together with Walter Stevens and Joseph Kane, at the June term of the criminal court of Cook county, for an unlawful assault upon Morgan H. Bell. In the first count of the indictment the plaintiffs in error and others were charged with making a felonious assault upon Morgan H. Bell with a certain revolver, to then and there unlawfully, willfully and with malice aforethought kill and murder the said Morgan H. Bell. There were six other counts in the indictment, but since the verdict found plaintiffs in error guilty in manner and form as charged in the first count of the indictment it will not be necessary to refer to the other counts. At the August term of said court, Connors, Gentleman, O'Connor and Storgaard were found guilty by a jury of assault to murder, and after overruling a motion for a new trial and in arrest of judgment they were sentenced to imprisonment in the penitentiary upon the verdict of the jury. Stevens and Kane were granted a change of venue and were not put upon trial with plaintiffs in error. The alleged errors in the application of the law to

the undisputed facts are relied on by all of plaintiffs in error for a reversal. Plaintiff in error Arthur O'Connor contends that the verdict as to him is contrary to the clear weight and preponderance of the evidence and the motion for a new trial should have been sustained as to him for that reason.

The facts out of which the legal questions arise, which all of plaintiffs in error contend were erroneously decided against them, are, in substance, as follows: It appears from the evidence that on and before April 20, 1911, in the city of Chicago, there were two rival labor unions of steam-fitters and associated employments. One of these organizations was known as the International Association of Steam-fitters. The other organization was known as the United Association of Plumbers, Gas-fitters, Steam-fitters and Steam-fitters' Helpers. For convenience the United Association of Plumbers, Gas-fitters, Steam-fitters and Steam-fitters' Helpers will hereafter be referred to as the "United Association," and the International Association of Steam-fitters will be referred to as the "International Association." On April 20, 1911, a large two-story building was being erected for the use of the Hygienic Ice Company, facing west on South Park avenue, which runs north and south. Just north of Park avenue, running east and west, is Twenty-sixth street, which is occupied, in part, by the tracks of the Illinois Central Railroad Company. The building being constructed had two stories or two floors. On the lower floor there was a large room about 65 by 150 feet, and a boiler room and an engine room, from which a stairway led to the second floor. The second or upper floor of the building was substantially one large room. At the time of the occurrences out of which this prosecution grows the walls of the building were up, floors laid, and the doors and some of the windows were in place. On April 20, 1911, there were at work upon the two floors of this building about thirty steam-fitters and steam-fitters'

helpers, who were engaged in installing steam pipes on the two floors of this building. There were also a few other workmen of other trades employed at the time on the building, making a total of some forty workmen who were employed in completing the building. The steam-fitters employed upon this building at the time in question were members of the International Association. Joseph Kane, who is jointly indicted with plaintiffs in error, had been a member of the International Association for many years, but on April 18, two days before the alleged assault was committed, he had left the International Association and become a member of the United Association and at once became a business agent for the United Association, acting jointly in that capacity with Maurice (or Moss) Enright, who had been a business agent of the United Association for some time previous. The headquarters of the United Association were in the Bush Temple building, and a man by the name of Burke was the secretary of the general association of the United Association. The evidence shows that the United Association was seeking to absorb the membership of the International Association, and that for this purpose Burke, as secretary, had sent out a communication to all of the steam-fitters advising them to desert the International Association (which is also called the old association) and join the new one, known as the United Association. It is a fair and reasonable inference from the proven facts that the "business agency" of the United Association to which Kane was appointed immediately upon his desertion of the International Association was given him, in part, as a reward for his desertion of the International and going over to the United Association, and with the expectation that his former connection with the International Association and acquaintance among the membership of that organization would make him a useful man in proselyting members from the International Association. About ten o'clock in the forenoon of April 20, 1911, three

or four men, led by Joseph Kane, appeared on the lower
floor of the Hygienic ice plant. Kane spoke to some of
his old associates and informed them that he was now the
business agent of the United Association. Kane and his
associates remained in the building a minute or two, and
then either went to the outer door or stepped out of the
door and in a few seconds re-appeared on the lower floor
with some fifteen or twenty other men. There is no dis-
pute as to the presence of all of the plaintiffs in error on
this occasion except as to Arthur O'Connor. The evidence
shows that a large portion of the men who appeared in this
building were armed with pistols. Their purpose in going
there armed with revolvers is made manifest by what was
done and said. Pistols were displayed and the members
of the International Association were commanded to take
off their overalls, cease work and go down and obtain
cards of membership in the United Association and then
return to their work. The men who were working on the
lower floor went up-stairs, where they were followed by
the attacking party. When the men were all gotten to-
gether on the upper floor they were lined up by the com-
mand of Kane and his associates and then commanded to
take off their overalls and go down and get cards from the
United Association. Naturally, in the excitement conse-
quent upon a sudden attack of this character, the witnesses,
honestly, no doubt, differ in describing the occurrences that
took place. There is, however, a general agreement among
the witnesses that the plaintiffs in error and their associ-
ates, through threats of violence and by the presentation of
drawn revolvers, sought to compel the members of the In-
ternational Association to cease work, take off their over-
alls and go down and join the United Association, threat-
ening that unless this demand was complied with they
would shoot or kill the members of the International As-
sociation. Morgan H. Bell, upon whom the alleged assault
to murder was committed, at the time of the attack was at

work on the lower floor. The evidence shows that some-
one of the attacking party, approaching Bell and Lefevre,
said, "Get that big son-of-a-b———." The men walked up
to Bell, and plaintiff in error Storgaard pulled a revolver
partly out of his pocket, presented the point at Bell and told
him to take off his overalls or "they would bore a hole
through him." Bell succeeded in getting away at that time
and went up-stairs, followed by two of his pursuers. Bell
gives the following account of what occurred after he got
up-stairs: "There was some of them got me there and put
their guns up to me. One of them held two guns at my
stomach and another one at my head, and told me if I
didn't quit my fooling and get out of there they would fill
me full of holes." Plaintiff in error Connors is identified
as one of the men who held a pistol on Bell, accompanied
by the threat above stated. This witness states that the
revolvers were held against him until he began to remove
his overalls. Plaintiff in error Gentleman is also identified
as one of the men who made the attack upon Bell. The
evidence shows that similar attacks were made upon other
workmen, who were commanded to take off their overalls
under pain of being shot, and to go down to Burke and
get a permit to work. Two of plaintiffs in error, O'Con-
nor and Connors, are shown to have made a similar attack
upon one Lettker, commanding him to take off his over-
alls, and threatening that if he did not do so to bore a
hole through him. Lettker complied with the request, as
did also Bell and others, to the extent of taking off their
overalls. Lettker says in his testimony: "I took the gen-
tlemen at their word. You know they said they were go-
ing to bore a hole through me, and I didn't want to be
riddled or killed, and I took the man's word." This wit-
ness identifies Kane, O'Connor, Connors, Gentleman and
Storgaard as being present and participating in the assault.
Pistols were also drawn upon Kapritzki, and he was com-
manded as were the others, and to him it was said, "If

you look for trouble I shoot you like a dog;" and again, "If you don't go right away you will get killed." A police station was only a block away. Some of the workmen had apparently escaped unnoticed and notified the police, and about the time that Kapritzki was being assaulted there was a cry of "Jiggers!" and "Coppers!" and at that moment a number of policemen appeared upon the scene. When the police arrived the attacking party made a hasty exit in all directions. Some of them ran down the Illinois Central tracks, some across the coal yards, and some in other directions. As he ran, plaintiff in error Gentleman was seen to throw a revolver away, and another, who went down the Illinois Central tracks, put his revolver by the fence, where it was afterwards picked up by a watchman and taken to the police station. All of the attacking party succeeded in making good their escape except plaintiff in error Storgaard, who was arrested by the police on the lower floor and a loaded revolver taken from him. The presence and participation of Storgaard and Gentleman in this affair is not denied. Connors testified that he was not present, but he is not corroborated in any substantial particular and the testimony is amply sufficient to justify a finding that he was present. Arthur O'Connor also denied that he was present, claiming that he was confined to his home at the time by illness. There is some evidence tending to corroborate O'Connor's testimony, which will be considered hereafter.

Plaintiffs in error contend that the trial court erred in giving instruction No. 9 on behalf of the prosecution. That instruction is as follows:

"The court instructs you as to the intent to kill alleged in the indictment, that though you must find that there was a specific intent to kill the prosecuting witness, Morgan H. Bell, still, if you believe, from the evidence, beyond a reasonable doubt, that the intention of the defendants was only in the alternative,—that is, if the defendants, or any

of them, acting for and with the others, then and there pointed a revolver at the said Bell with the intention of compelling him to take off his overalls and quit work, or to kill him if he did not,—and if that specific intent was formed in the minds of the defendants and the shooting of the said Bell with intent to kill was only prevented by the happening of the alternative,—that is, the compliance of the said Bell with the demand that he take off his overalls and quit work,—then the requirement of the law as to the specific intent is met."

The plaintiffs in error earnestly contend that pointing a loaded revolver at another within shooting distance and threatening to shoot unless some demand made by the assaulting party is complied with cannot be held to be a felonious assault with intent to kill and murder, for the reason that the intent is in the alternative and is coupled with a condition, and for that reason is not a specific intent to kill, which is necessary to sustain a conviction for an assault with an intent to murder. All the authorities agree upon the general proposition that in a prosecution for an assault with intent to murder, or with intent to commit some other felony, the specific intent charged is the gist of the offense and must be proven as charged in the indictment. (*Crosby* v. *People,* 137 Ill. 325; *Friederich* v. *People,* 147 id. 310.) Upon this and like authorities where the general rule is stated, plaintiffs in error contend that the intent to commit the crime charged must be absolute and unconditional, and that if a dangerous weapon is presented in a threatening manner, accompanied with a demand upon the assaulted party and a threat to destroy his life unless such demand is complied with, the offense can not be an assault to murder. It is argued that the condition which accompanies the threat negatives the existence of that positive and specific intent which, under the law, is a necessary element in the offense charged.

No case decided by this court is cited by either party, and we are not aware that any such case exists, that is conclusive of the precise question which is raised here. In support of the view that an assault with a loaded revolver and a threat to shoot unless the party assaulted complies with a demand is not an assault with an intent to murder, plaintiffs in error rely with great confidence upon the case of *Hairstron* v. *State,* 54 Miss. 689. In that case Hairstron, in company with others, attempted to remove the personal effects of a laborer from the plantation of his employer, Richards, to whom said laborer was indebted on account of advances of money or provisions made to said laborer. Hairstron was in the act of hauling away the household furniture when Richards attempted to stop the wagon and took hold of Hairstron's mules, saying that he could not move the household goods until his debt was settled. Thereupon Hairstron drew a pistol and pointed it at Richards and said, "I came here to move Charles Johnson and by God I am going to do it, and I will shoot any God damned man who attempts to stop my mules," at the same time urging his mules forward as he spoke. His manner was threatening and angry and his voice loud and boisterous. Other persons who were accompanying Hairstron, some of whom were armed with guns, pressed around Richards, as if they intended to aid Hairstron if necessary. Richards was deterred by the apparent danger and released the mules and the wagon moved on. Under the above facts Hairstron was convicted of an assault with an intent to murder Richards. The conviction was reversed by the Supreme Court of Mississippi. The reasoning of the court in that case is as follows: Richards was in the act of committing a trespass upon Hairstron's property by laying his hands upon the mules and forcibly stopping Hairstron upon the public highway. Hairstron had a right to protect his property from such unlawful trespass, using no more force than was necessary. His threat to shoot was

conditioned upon a demand which he had a right to make. In disposing of the case the Supreme Court of Mississippi uses the following language: "Here there was only a conditional offer to shoot, based upon a demand which the party had a right to make. While the law will not excuse the assault actually committed in leveling the pistol within shooting distance, it cannot, from this fact alone, infer an intent to murder. The intent must be actual,—not conditional,—and especially not conditioned upon non-compliance with a proper demand." A careful analysis of that case will show that the court laid special stress on the circumstance that the threat to shoot was coupled with a demand which the prisoner had a lawful right to make.

*State* v. *Taylor,* 70 Vt. 1, *Botsch* v. *State,* 43 Neb. 501, *People* v. *Mize,* 80 Cal. 41, and *Chrisman* v. *State,* 54 Ark. 283, are also cited and relied on by plaintiffs in error in support of the position assumed by them upon the question under consideration. None of those cases, however, are similar in their facts to the case at bar. They are all cases supporting the general proposition that a conviction for an assault with intent to murder cannot be sustained without proof of the specific intent to take life charged in the indictment. The rule stated in those cases is well established and has been frequently announced by this court. The *Hairstron case* above referred to seems to be the only decision that lends any support to the position contended for by plaintiffs in error, and that case is clearly distinguishable from the case at bar. We think that the position of plaintiffs in error may be satisfactorily answered without repudiating the authority of the Mississippi case cited and without in any way departing from the general and well established principles laid down in the other cases relied upon. Unlawfully pointing a loaded revolver at another within shooting distance, in a threatening manner, undoubtedly, under all of the authorities, constitutes an assault. The character of the assault, whether felonious or other-

wise, depends upon the intent of the person charged. If an assault be made with a loaded revolver with an intent to kill and murder the party assailed, and the assailant is prevented from carrying out his felonious purpose by the intervention of some fact not of the assailant's own will, the offense is complete, regardless of whether the weapon is discharged or not. (*Hardy* v. *State*, 36 Texas Crim. 400; *Thompson* v. *State*, 37 id. 448; *State* v. *Dooley*, 121 Mo. 591.) The foregoing propositions are so well established that we do not deem it necessary to elaborate them. In the case at bar the evidence shows that plaintiffs in error, or some of them, pointed revolvers at the prosecuting witness and threatened to shoot him unless he quit work, took off his overalls and procured a card from the United Association. It will be noted that the demand made upon the prosecuting witness and others at work upon the building was one which plaintiffs in error had no lawful right to make. They might properly in a peaceful manner solicit persons to unite with their association, but they could not lawfully use force, violence or intimidation to accomplish such purpose. The demand with which the members of the International Association were required to comply under pain of being shot by plaintiffs in error and their associates was unlawful, and plaintiffs in error had no right to expect that it would be complied with. The distinction between the case at bar and the *Hairstron case* is, that in the latter the condition upon which the threat to shoot was made was lawful while in the case at bar the demand was unlawful.

In McClain's Criminal Law (section 232) the rule applicable to the case at bar is thus stated: "If the threatened injury, coupled with present ability to inflict it, is conditioned upon the party assailed refusing to do something which the assailant has no right to require him to do, it will constitute an assault even though the conditions are complied with and therefore no violence is used." The

quotation above made is supported by *Thompson* v. *State, supra, State* v. *Morgan,* 3 Ired. 186, *State* v. *Dooley, supra, Hardy* v. *State, supra, State* v. *Church,* 63 N. C. 15, and numerous other authorities.

' In *State* v. *Morgan,* above cited, the facts were as follows: Morgan was charged with an assault upon a man by the name of Cantrell. The assault grew out of a quarrel for the possession of a gun which Cantrell had. Morgan demanded the gun and Cantrell refused to give it up, whereupon Morgan stepped up within reach of him, held up an ax in a position to strike, and said, "Give up the gun or I will split you down." Cantrell did not at the time give up the gun but proposed some arrangement, upon which Morgan laid the ax down. The matter was arranged and Cantrell gave up the gun. The jury found that Morgan, at the time he went up to Cantrell and raised the ax within reach of him, intended to strike unless Cantrell gave up the gun but did not intend to strike if Cantrell gave it up. In the course of the opinion Gaston, J., used the following language: "The present case is one of a very different character. The act was not only apparently a most dangerous assault but accompanied with a present purpose to do great bodily harm, and the only declaration by which its character is attempted to be changed is, that the assailant was not determined to execute his savage purpose unconditionally and without a moment's delay. He had commenced the attack and raised the deadly weapon and was in the attitude to strike, but suspended the blow to afford the object of his vengeance an opportunity to buy his safety by compliance with the defendant's terms. To hold that such an act, under such circumstances, was not an offer of violence,—not an attempt to commit violence,— would be, we think, to outrage principle and manifest an utter want of that solicitude for the preservation of peace which characterizes our law and which should animate its administrators. To every purpose, both in fact and in law,

the attack on the prosecutor was begun, and in the pause which intervened before its consummation, most happily for both parties, an arrangement was made which prevented the probably fatal result. But this pause, though intentional and announced when the attack began, does not prevent that attack from being an offer or attempt to strike. If a ruffian were to level his rifle at a traveler and announce to him that he might have fifteen minutes to make his peace with his God, and the unfortunate man should save his life by prayers, by remonstrance, by money, or by any other means before the expiration of that time, could it be pretended that there had been no attempt nor offer to hurt him because the intent was not to kill instantaneously and therefore did not accompany the act? Will it be doubted if a bully should present his pistol at a citizen and order him, under pain of death, not to walk on the same side of the street with him, whether there was an offer of violence because the purpose to kill was not absolute, but conditional, merely? Wherever the act is done in part execution of a purpose of violence, whether that purpose be absolute or provisional makes no difference as respects the question whether the act be an assault."

The case of *Thompson* v. *State, supra,* was as follows: Two prisoners by the names of Hardy and Thompson made an attack upon their jailer for the purpose of escaping, one using a razor and the other a revolver. The revolver was pointed at the jailer and he was commanded to go into the cell. The revolver was not discharged. In passing on that case the Supreme Court of Texas said: "Moreover, there can be no question of the intent to kill the said McAfee [the jailer] when he drew the pistol on him and commanded him to go into the cell, if said McAfee had refused to do so. Defendant had no right to make this demand of said McAfee, and if he had refused to comply and had shot him and killed him he would have been guilty of murder, and as he intended to kill or make him comply with the un-

lawful command he was guilty of an assault with intent to murder." The case of *Hardy* v. *State, supra,* was presented to the Supreme Court of Texas under a similar state of facts and the same ruling was made as in the *Thompson case.*

The rule to be deduced from these cases is correctly stated in the quotation above made from McClain's Criminal Law. An assault to murder, under this rule, may be complete where it is shown that the assailant, with the present ability to destroy life or do great bodily harm, draws a dangerous weapon on another and threatens to kill him unless the party assailed complies immediately with some unlawful condition or demand. The law will not tolerate excessive violence or intimidation for the purpose of enforcing or defending one's legal rights, and when resorted to for the purpose of carrying out an unlawful enterprise it becomes criminal, and where there is an attempt, coupled with the present ability, to commit a felony and the assailant suspends the execution of his purpose merely to give his victim a chance to comply with an unlawful demand, the offense is complete even though the commission of the felony is averted by the submission of the assailed party to the unlawful demands made upon him. In the commission of every crime there must be a union or joint operation of act and intention or criminal negligence. The act committed is ordinarily susceptible of direct proof by facts which are discernible by the natural senses. The intent or purpose exists only in the mind of the accused, and, like malice, or any feeling, emotion or mental status, is manifested by external circumstances capable of proof. By whatever means it is ascertained, the intent must be direct and specific to commit the precise offense charged. Thus, if an assault is charged with an intent to commit one felony, proof of an assault to commit another and different offense will not sustain the charge. Is an intent to commit an offense which is coupled with an unlawful condition or de-

mand, such as plaintiffs in error made upon the prosecuting witness, a direct and specific intent within the meaning of the rule of law on that subject? We think it must be so held. To hold otherwise would be to permit one guilty of violating the peace of society and the security of persons and property guaranteed to everyone, to profit by his unlawful conduct. The law will not tolerate and encourage threats of violence and death to enforce unlawful demands made upon helpless and defenseless persons by counting such acts of the perpetrator as righteousness when he is arraigned at the bar of the court where justice is administered and crime punished. In such case the unlawful character of the demand eliminates it from consideration and the act will be judged in its naked criminality, stripped of any benefit or palliation based upon the unlawful demand or condition. If an attempt is made to commit an assault and a threat is conditioned upon the party assailed performing some act which is known to be a physical impossibility, such a condition cannot possibly destroy or in any way modify the criminal character of the act. In such case the assailant, knowing the impossibility of compliance with his demand, will be held to have a specific intent to inflict the threatened harm. An impossible condition is no condition. So of an unlawful condition. No one has a right to expect or presume that anyone will submit to an illegal demand made upon him, and where, as in the case at bar, a violent assault with dangerous and deadly weapons is made upon a person in the peace of the people and a threat to destroy life is made unless the victim complies with some unlawful demand, in determining the guilt or innocence of the accused the case must be determined precisely as though the unlawful demand did not exist. Instruction No. 9 stated a correct principle of law and there was no error in giving it to the jury.

Some complaint is made by plaintiffs in error of the rulings of the court as to other instructions, which we have

considered but find nothing in connection with these rul-
ings of sufficient importance to require discussion.

Plaintiffs in error complain of the ruling of the court
in admitting evidence tending to show that three or four
days before the difficulty four men came to the Hygienic
ice plant, and the prosecuting witness was permitted to de-
tail his conversation with these parties. The conversation
was, in substance, as follows: The four men in question
came up to where the prosecuting witness was working and
asked him what he was doing there, to which he replied,
"I am working." They asked, "What kind of a card have
you got?" and the witness replied, "I have got an Inter-
national steam-fitter's card from local No. 2." The witness
was then asked by some of the party whether all of the
men on that job had cards and said that they had. One
of the men said, "That is all right, pal; we will get you
afterwards," and they went away. The objection to this
testimony is based upon the assumption that the four men
who visited the plant at that time were not shown to be
among those who were present at the time of the difficulty.
The evidence is not very clear as to the identity of the men
that were there on the first occasion, but the evidence tends
to show that the four men who came to the ice plant on the
first occasion were also there at the time of the difficulty.
The prosecuting witness was asked whether he had seen
"any of those men at the building before," to which he an-
swered, "Yes, I saw—there was four of them came two
days before, on the 18th of April; I don't know their
names but I would know their faces if I saw them." He
was then asked whether he saw the same men on the 20th
that were there on the first occasion, to which he replied,
"Yes, I saw that little dark electrician there, with Kane."
We think it was entirely proper to show that anyone who
was present on the day of the difficulty had visited the plant
previously, and also to show what such person did or said.
Whether the persons referred to by the witness as being

present on the first occasion were in the party on April 20 was a question of fact for the jury. The evidence fairly tended to show that the men with whom witness had the conversation were in the party on the day of the difficulty. There was no error in the admission of this testimony.

Plaintiff in error O'Connor interposes for himself the defense of an alibi. He testified in his own behalf that he was not present at the time of the difficulty and that he was at that time confined to his home with rheumatism. Thirteen witnesses were called and testified in support of the alibi. Of these witnesses only three, Herbert O'Connor, (a brother,) Mrs. Herbert O'Connor and Sam Craill, testified to having seen O'Connor at home in bed at or near the hour of the commission of the offense at the Hygienic ice plant. The witnesses in support of the alibi testified that O'Connor was taken suddenly and severely ill with rheumatism about the middle of March, and that he was unable to leave the house from that time until a few days after the 20th of April. Some of these witnesses testified that O'Connor was dangerously ill in the early part of April, and some of them stated that he was so ill that he could not move himself in bed and had to be assisted to do so. To meet this evidence the State produced as witnesses judges of the election in O'Connor's precinct, who testified that O'Connor voted at the city election on April 4 and again at the judicial primary on April 11, and that he appeared to be well and healthy. O'Connor was recalled to the stand, and in his second examination he admitted that he had voted on the two occasions testified to by the election officials. An affidavit which he had made in support of an application for bail was also introduced, wherein O'Connor swore that he was taken ill with articular rheumatism in December, 1910, and was compelled to stay in bed, under the care of Dr. Griffith, for a period of about six weeks. This testimony, when taken in connection with the evidence tending to identify O'Connor as one of the

party that visited the ice plant on the 20th of April, is sufficient to justify the jury in rejecting the evidence as to the alibi. It was at least a controverted question of fact for the jury to determine. The verdict of the jury upon this question is not so contrary to the evidence as to warrant us in disturbing the verdict.

We find no error in this record requiring a reversal of the judgment below. It is therefore affirmed.

*Judgment affirmed.*