STATE OF MAINE *vs.* CHARLES A. QUIGLEY.

Kennebec.        Opinion, April 29, 1938.

*Francis A. Bate,* County Attorney for the State.
*Henry C. Sullivan,*
*Atwood C. Nelson,* for respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

BARNES, J.   This case comes up on exceptions.

The respondent, then forty-five years of age, living with his wife in the City of Augusta, was tried and convicted of assault upon his wife with intent to kill and slay, he then being armed with a dangerous weapon, a shotgun.

It is not denied that in the early evening of August 18, 1937, respondent shot his wife, as she ran from their bedroom, several shot from the gun penetrating her lower back and one leg. One earlier shot, discharged while both had hands on the gun, went through a wall-partition, and a third was fired through a window of the apartment. The apartment was in the second story of the house.

Summoned by telephone, two of the city police arrived at the home at seven-thirty or seven-thirty-five, saw Mrs. Quigley in the lower hall, bleeding from her wounds.

They telephoned for gas bombs, and after two more officers arrived, respondent called to them, "Come up, I haven't any gun," and they went upstairs to the bedroom, arrested the respondent, clothed him and conveyed him to police headquarters.

Mrs. Quigley was taken to a hospital and discharged after nine days.

At the trial the defense advanced was that through voluntary use of drugs respondent had gotten himself into such a state of mind that when he shot his wife he could not form or entertain an intent to kill and slay, as alleged in the indictment.

The assault is proved. A loaded gun is a dangerous weapon, when used within striking distance from the victim. *State* v. *Godfrey*, 17 Or., 300, 20 Pac., 625, Case Note to *Crow* v. *Texas*, 21 L. R. A. (N. S.) 497.

Where, as here, the intent forms the gist of the offense it must be specifically proved. *State* v. *Neal*, 37 Me., 468.

"In the commission of every crime there must be a union or joint operation of act and intention or criminal negligence. The intent or purpose exists only in the mind of the accused, and, like malice, or any feeling, emotion or mental status, is manifested by external circumstances capable of proof."

*People* v. *Connors et al.*, 253 Ill., 266; 97 N. E., 643.

"The general presumption is that every man is normal and is possessed of ordinary faculties; such defenses as intoxication, insanity, and aphasia (or a mind not conscious of its acts) are affirmative defenses, and the burden is on the defendant to establish them."

*Commonwealth* v. *Morrison*, 266 Pa., 223, 109 A., 878; *Territory* v. *Davis*, 2 Ariz., 59, 10 Pac., 359; *Clore* v. *State*, 26 Tex. App., 624, 10 S. W., 242; *Cleveland* v. *State*, 86 Ala., 1, 5 So., 426; *State* v. *Truitt Del. Gen. Sess.*, 1905, 62 A., 790; *Wilson* v. *State*, 60 N. J. L., 171, 37 A., 954; *State* v. *Letter*, 4 N. J., Misc. R., 395, 133 A., 46; *Com.* v. *Iacobino* (1935), 319 Pa., 65, 178 A., 823; *Booher* v. *State*, 156 Ind., 435, 54 L. R. A., 391, 60 N. E., 156; *People* v. *Lewis*, 36 Cal., 531; *United States* v. *King*, 34 Fed., 302.

Considering now the testimony produced before the jury, it appears that respondent, on the date of the alleged criminal act, was

afflicted with the disease known as shingles, from which he had been suffering, and for which he was treated by a doctor, for some ten days.

When his wife came home from a store, which she operated, at about seven in the evening, bringing to respondent a box of food, and called to him as she walked up the stairs, "Hello, dear," he came out of the study, entirely nude, made no answer, and she went into the bathroom. He was then in the bedroom, and as she passed in toward the dresser, respondent secured a gun from a closet and advanced toward his wife. She seized the barrel of the gun. One shot was fired, and she fled, respondent shooting her as she went through the doorway.

What then was his mental ability to form and act upon an intent to shoot his wife? The answer can only be gathered from his acts and sayings before and immediately after the shooting.

Intoxication from voluntary use of drugs is his defense.

"A simple plea of not guilty, puts in issue the allegations and only the allegations in the indictment, and as to them the prosecution has the affirmative. But if the accused would put in issue any other allegation, any question as to his capacity or responsibility, he must do it by an affirmative statement. If he puts in the plea of insanity (voluntary intoxication) he assumes the affirmative, he changes the issue. And it is immaterial whether it is in writing or merely verbal; in either case it just as effectually raises a new issue. It is true it may be resorted to in connection with the plea of not guilty, but it is not and can not be a part of it.

The plea of insanity (voluntary intoxication) is, and of necessity must be, a plea of confession and avoidance. It does not deny a single allegation in the indictment, but simply says, grant all these allegations to be true, that all these acts have been done, and still guilt does not follow, because the doer of them is not responsible therefor.

It does not meet any question propounded by the indictment, but raises one outside of it.

It is not a mere denial but a positive allegation. . . . When insanity (voluntary intoxication) is found, it does not show that the act was any less wilful, or deliberate, or intentional even; but it does show an excuse, an irresponsibility for what would otherwise have been criminal.

So here, as in other respects, the plea of insanity (voluntary intoxication) does not deny, but avoids; confesses this element as well as the others, but excuses. It would seem, then, that the question of insanity (voluntary intoxication) can never be raised, unless by the prisoner; and by him only in an affirmative allegation, such as carries with it the burden of proof."

*State* v. *Lawrence*, 57 Me., 574, 583; *State* v. *Kavanaugh*, 4 Pen. (Del.) 131, 53 A., 335; *State* v. *Bacon* (Del. 1920), 112 A., 682.

The four officers who first saw the respondent, at his house, a few minutes after the shooting, each heard respondent invite them upstairs and his statement that he had no gun then; observed him as he was being dressed.

One testified that "his eyes looked kind of wild and that he was nervous"; another officer, that he was not feeble, but walked unassisted to the bathroom where he took a pill.

Officer Dudley found the shotgun in the closet, with four loaded shells in the magazine, one in the barrel.

Officer Dowling dressed the respondent, and testified that, speaking of his wife, he said, "God damn her, she wouldn't get me a doctor." He, with Officer Tardiff, took the respondent to the police station, in a car, and testified that while riding, respondent said he "was going to ship McKay" (his doctor); and that he further said, "That wife of his took all those pills away from him."

Pressed for the exact expression the officer answered, "God damn her, she took those pills away too."

Deputy Chief Dickson, one of the four officers who first saw the respondent, after the shooting, testified that he returned to the police station, and that as he went into the room where Mr. Quigley was, the latter asked, "How's Jessie?" He said, "She is in the hospital," and that Quigley then said, "Oh, my God!"

Two officers returned at once to the Quigley apartment, and found it locked. It was opened for them, and searching they found an empty shotgun shell in a waste basket in the bathroom, and two empty shells in a waste basket in the living room, in each basket the shells were at the bottom and the baskets were about half filled with crumpled paper thrown therein.

The shells were 20-gauge, to fit the gun used, and when recovered by the officers "smelled of powder."

Dr. Curtis W. Dyer, a witness called by the defense, appears from the record to be the first person to see the prisoner at the station.

He came at the request of an officer at some time after eight o'clock. A fair statement of what the jury heard Dr. Dyer testify is that he found the prisoner groaning, observed the effect of shingles; the pupils of his eyes half dilated, eyes staring and bulging, no redness or inflammation, indicating, with other symptoms, that he was not under the influence of an opium derivative, meaning morphine, codein, or any of the opium salts. His speech was slow, coherent, but he was inclined to ramble in his conversation and go into other subjects than those inquired of: answers were "slow but well answered. I concluded that he was obviously under the influence of some sedative, probably barbital, not a pain-relieving drug; a soothing drug."

The doctor remained with the prisoner for about three quarters of an hour: asked him questions relative to his family life, leading to the shooting, and was told he "had repeatedly asked for medical attention that had been refused him, and had done so on this particular day."

The doctor considered him bewildered, but that he was then "capable of judging right from wrong." Asked by the court as to prisoner's comprehension of the nature and quality of his act, the doctor testified that when he was questioning him "there was no mental condition except that which would allow him to know right from wrong. . . . He was then a man with fair judgment . . . would (then) have understood the nature of the act and the quality of it."

Dr. R. L. McKay, also called by the defense, had been respondent's physician. He saw respondent and prescribed for him on August eight and ten before the assault, diagnosed the illness as shingles, and on the tenth of August prescribed and furnished twelve tablets, salcodeia, a quarter grain of codein, a derivative of morphine, but refused to give him a prescription for morphine, fearing he would take it too often. On that date his mind appeared to be fairly normal.

Two days later the doctor prescribed a like amount of the same tablets.

Testifying as to the appearance of respondent's eyes, Dr. McKay said, "Mr. Quigley's eyes have always been quite prominent. As I saw him on the tenth of August, I did not notice anything especially about the eyes."

Called by respondent, over the telephone on the afternoon of August fourteenth, the doctor said respondent asked for medicine to relieve pain, but none was prescribed.

He testified that barbital and salcodeia would depress the mental processes and slow up the functions of the body, would tend to produce incoherence in speech, drowsiness but not excitement, and restful sleep.

A local druggist testified that respondent had bought barbital.

Dr. Sherman testified that on the evening before the assault respondent approached him on the street asking for morphine, but was refused; and a friend who drove him home at about eleven P. M. of the seventeenth testified that he seemed to be under the influence of something, seemed quite feeble, groaning and complaining about pain.

Dr. Priest, called by respondent, on the fifteenth of August, examined him in his bedroom, found him suffering from a "rash," but apparently under the influence of a sedative or drug, a hypodermic needle lying on the table.

Respondent asked that the doctor get him some morphine, but was refused. He complained of loss of sleep, was not highly nervous.

Mr. Quigley stated his educational experience, attendance in school, college and graduation from a theological seminary; that he was for some years active in the ministry, still holding credentials authorizing him to preach; that he was forty-five years of age at time of trial; had been married four times, though one marriage was annulled.

On the morning after the assault, respondent was committed to the State Hospital, for determination of his sanity, and on the next Monday Dr. Tyson, the Superintendent of the hospital, examined him.

As Dr. Tyson testified, that examination showed respondent "to be a man of extraordinary intellectual ability." He then presented no conduct of disorder, was well oriented, possessed of an excellent memory, no emotional variations; seemed to have good understand-

ing of his situation. Dr. Tyson would not expect barbital to cause insanity. Respondent was discharged from the hospital on September fifteenth, following.

This statement of the testimony in the lower court is perhaps unduly extended, but the defense having relied on lack of mental capacity to harbor the intent which is the gist of the accusation, evidence of the mental state of the respondent was the only guide for the jury.

At the close of the evidence counsel for respondent moved for a directed verdict of not guilty.

This motion was overruled by the court and exception taken.

The ruling was right.

In this century the authorities agree that when in a criminal trial, where intent to do the criminal act charged must be proven, and insanity is not pleaded, but voluntary intoxication whether from alcohol or drugs, the jury, if not satisfied of the presence of the specific intent, may find the respondent guilty of a lesser crime rather than "not guilty."

To release this respondent would be to hold that there was not evidence sufficient to justify the jury in finding that, at the time of the shooting, respondent's mental capacity was insufficient to form an intent to kill his wife, and to maintain that intent until, acting upon it, he pointed the gun at her retreating form and discharged it.

This question is one of fact, and exclusively for the jury. Compare *State* v. *Lawrence,* 57 Me., 574; *State* v. *Gilman,* 69 Me., 163; *State* v. *Cady,* 82 Me., 426, 19 A., 908; *State* v. *Hersom,* 90 Me., 273, 38 A., 160; *State* v. *Knight,* 95 Me., 467, 50 A., 276. Careful study of the record convinces us that the verdict should not be disturbed. The first exception is overruled.

At the close of the charge to the jury, counsel for respondent requested an instruction in the following words:

"If he got himself into a condition through voluntary use of drugs so he did not know the difference between right and wrong, he would not have the specific intent required in the indictment."

It is stated in the bill of exceptions that no part of the charge of the presiding Justice gave the requested instruction in the same or different language.

That question is for this Court to determine, and the assertion in the bill of exceptions is to be tested here by comparison with the charge, which should have been printed in the bill. *Feltis* v. *Lincoln County Power Co.*, 120 Me., 101, 112 A., 906.

But, rather than to overrule the exception on this ground alone, it may be noted that on the issue as to whether respondent had so drugged himself as not to be capable of forming and acting on the specific intent essential in the perpetration of the crime charged, the wording of the requested instruction is not appropriate. As this Court said in 1901: "It is still held by an overwhelming weight of judicial authority that (it is) when the insanity of the accused is pleaded in defense" ability to distinguish between right and wrong is the test. *State* v. *Knight*, supra. . . .

In the case at bar, insanity is not the plea.

When it is attempted to prove the presence of insanity, madness, in early cases termed phrenzy, a test uniformly applied is to determine whether or not the one charged with doing a criminal act possessed, at the time of the act capacity to know the difference between right and wrong.

The instruction, as worded, throws no light on the problem presented to the jury by the defense, that the mental capacity of the respondent was not sufficient to form an intent to kill his wife.

On a similar indictment the following charge was held proper. "If it appears from the evidence that the prisoner was intoxicated at the time, and if you find that his state of intoxication was such that he had so far lost his intelligence, and his reason and faculties, that you have a reasonable doubt whether he was able to form and have a purpose to kill, or to know what he was doing, then you should find him not guilty of intent to kill." *State* v. *Fiske*, 63 Conn., 388, 28 A., 572; *State* v. *DiGuglielmo Del. Gen. Sessions* (1903), 55 A., 350; *State* v. *Diaz*, 76 Utah, 463, 290 Pac., 727.

The requested instruction was properly refused.

> *Exceptions overruled.*
> *Judgment for the State.*