## No. 8712.

## ZANCANNELLI v. THE PEOPLE.

1. CRIMINAL LAW—*Jurors—Competency—Opinion as to Guilt or Innocence*, even though expressed, does not necessarily disqualify a juror. (Rev. Stat., sec. 3691 *et seq.*) But the accused is entitled to interrogate those summoned to form the panel, not only in order to show cause of challenge, but to enable him to decide whether or not to make a peremptory challenge, if his challenge for cause shall be denied.

2. *Fair Trial—Examination of Jurors.* The accused, a coal miner, and a member of the United Mine Workers, which conducted, on the side of the employees, an industrial conflict with the owners of the coal mines of Las Animas County. He was convicted of the murder of a detective employed by the mine owners. The theory of the prosecution was that the murder was committed "for the good of the Union."

The accused contended, and the evidence on his part tended to show that another, who had been seen fleeing from the place of the homicide was the guilty party.

Several of the jurors stated upon an examination by the prosecution that they had formed opinions, but could nevertheless give the prisoner a fair and impartial trial. The prisoner's counsel proposing to interrogate the jurors as to whether they would enter upon the trial, according to the prisoner the presumption of innocence, an objection to the question by the prosecution was sustained. The prisoner exhausted his peremptory challenges, and several veniremen as to whose state of mind examination by the prisoner had been prohibited, served upon the panel over the objections of the prisoner.

Other questions propounded to these jurors, and excluded, were directed to the question, Whether they entertained any bias or prejudice against the striking coal miners, or the United Mine Workers; Whether the juror had taken any part on either side, in the coal strike; Whether he had advocated the forcible deportation of the striking miners, or was a member of an organization that had advocated such deportation; Whether the juror thought he knew what verdict ought to be rendered; Whether he was an active partisan on either side in the coal mine strike; Whether he participated in any of the battles that occurred during that strike; Whether he was desirous of serving on the jury; Whether he had read any of the literature sent out by the coal companies touching the Zancannelli case—the prisoner proposing to show that the

coal companies had distributed literature stating not only that the prisoner was guilty, but that he had confessed his guilt; Whether the juror had taken part in the industrial conflict; Whether he acted as a deputy sheriff to go out on the armored cars of one of the coal mining companies; Whether the juror knew how the sheriff came to summon him as a juror, "a man who had been in those battles."

To a juror who stated that his business association with the coal companies would tend to bias him; Whether he would or would not like to decide the case contrary to the views of the coal companies.

This juror was one to whom the prisoner's challenge for a cause was overruled, and who, the prisoner's peremptory challenges being exhausted, sat upon the panel.

Of other jurors the prisoner proposed to ask them whether they now regarded the prisoner as a guilty man; Whether the juror would not require prisoner to prove himself innocent. Other jurors who were interrogated as to what they understood by the presumption of innocence; As to which way his verdict would be if the evidence were evenly balanced. One juror having stated that he followed a former trial of the prisoner through the papers, with interest, and had a fixed opinion which it would require evidence to remove, declared, in response to questions by the presiding judge that he would decide the case solely upon the evidence; on re-examination by prisoner's counsel he stated that he had often expressed his opinion, and would not lay it aside until he had heard clear, strong and convincing evidence. The challenge to this juror for cause was overruled, and the court refused to permit inquiry as to bias or prejudice and sustained an objection made by the juror himself, to a question as to whether he could go into the trial presuming the prisoner innocent.

One Burkhart having testified in his examination upon the *voir dire* that he had business relations with the coal companies, and that this might tend to bias or prejudice him, the court refused to permit prisoner's counsel to ask him whether he would not dislike to decide the case contrary to the views of the coal companies, or whether he could enter upon the trial giving the prisoner the benefit of the presumption of innocence. Burkhart having been accepted and sworn on the jury, over the prisoner's objection, the prisoner's counsel, before any evidence heard, applied by petition for leave to further interrogate him. The petition was supported by the affidavit of one Rollins, to the effect that during the former trial of the prisoner he and Burkhart had made a wager upon the

result; that they had made another wager upon the result of the pending trial, and that afterwards Burkhart had offered to make another bet, stating that if he, Burkhart, were accepted as a juror, there would be "either a hung jury, or a hung dago." Nothing contrary to the averments of the petition was shown. Nevertheless the application of the prisoner for leave to further examine the juror was denied.

*Held* that the interrogation of the jurors proposed by prisoner's counsel was proper, and within his right, and that the errors committed in these preliminary matters invalidated the proceedings at the very beginning.

*Error to Las Animas District Court, Hon. Granby Hillyer, Judge.*

Mr. O. H. DASHER, Mr. FRED W. CLARK and Mr. HORACE HAWKINS, for plaintiff in error.

Hon. LESLIE E. HUBBARD, Attorney General, for the People.

*Per Curiam: En Banc.*

ZANCANNELLI, hereinafter referred to as defendant, was convicted upon the charge of having murdered one Belcher, at the City of Trinidad, and sentenced to life imprisonment. He brings the cause here for review relying upon many alleged errors.

The killing took place during the period of the recent industrial conflict in the coal fields, between the owners of the coal mines and their employees, and was, the State claimed, incident thereto. The Attorney General neither filed the information nor participated in the prosecution, and in this court has filed a confession of error. Ordinarily, under such circumstances, we would enter judgment of reversal without comment. The nature of the case, however, is such that we think a good purpose will be served by briefly stating the facts and commenting upon the same.

The deceased was a detective in the employ of the mine owners, and the defendant was a striking coal miner, and

an inmate of the temporary shelter of such miners known as "The Ludlow Tent Colony." The prosecution introduced evidence to the effect that the defendant had stated that he had killed the detective "for the good of the union." The defendant claimed, and offered to prove, that several large coal mining companies operating in the district were actively interested in the prosecution, and at their request and employment the Hon. Jesse G. Northcutt appeared in the case and aided the District Attorney. A petition, supported by affidavits, was filed by defendant alleging interest and prejudice on the part of A. W. McHendrie, Judge of the Court, and asking that another judge be called in to try the case, which was sustained. Thereafter, by an act of the Legislature, an additional judge was provided for the district and the Governor appointed Hon. Granby Hillyer to the position, and a like petition for change of judge was filed against him. The petition was denied and, upon trial, the jury failed to agree and was discharged. Fifteen days thereafter the defendant was again placed on trial before Judge Hillyer and was convicted, as hereinbefore stated.

The evidence on the part of the prosecution was to the effect that defendant had shot Belcher, as charged in the information, while that on the part of defendant was to the contrary, and tended to show that one of two other men, whom it was claimed had been seen fleeing from the place, was the guilty party, and that the arrest and prosecution of defendant was the result of mistaken identity. Several of the proposed jurors stated, upon examination by the prosecution, that they had formed, expressed, and then held, opinions concerning the guilt or innocence of the defendant; that such opinions and impressions were based upon hearsay rumors, conversation with other persons, newspaper articles, etc.; but that notwithstanding such opinions they could give the defendant a fair and impartial trial, according to the law as it should be given to them by the court under the evidence submitted in the case. Some of the proposed jurors stated that they had

never formed or expressed any opinion concerning the case. Upon examination by the defense, each of the proposed jurors was asked the following question in words or substance: "Can you start out on the trial of this case giving to the defendant the benefit of the legal rule that a defendant must be presumed to be innocent until he is proven to be guilty?" To this question an objection was interposed by the prosecution, which, when propounded to those who had previously stated that they had not formed or expressed an opinion concerning the case, was overruled by the court, and they were required to answer; *but when propounded to those who had stated they held opinions, or had formed or expressed opinions concerning the guilt or innocence of the defendant, the objection was sustained and the juror not permitted to answer.* The defendant exhausted his peremptory challenges, and several of the veniremen, to whom the question was propounded, and who were not permitted to answer, served as jurors in the case over the objection and exception of defendant. Substantially every question propounded by the defense to elicit the condition of mind of the jurors respecting the defendant, the parties to the prosecution, and the subject matter of the action, was ruled out by the court as improper. As an example we set forth the following, to which the court sustained objections and refused to permit the jurors to answer, viz.:

"Have you any bias or prejudice touching the striking coal miners, either for or against them?"

"Have you taken an active part on either side of the recent coal strike?"

"Have you favored or advocated forcible deportation of the striking miners in this country?"

"As you sit there now, do you think you know what ought to be done in this case or what verdict ought to be rendered?"

"Have you ever talked with any one who was a mine guard, about the strike matters?"

"Have you any bias for, or prejudice against an organ-

ization, without intimating which way, known as The United Mine Workers of America?"

"Are you a member of any organization that during the recent troubles advocated forcible deportation of miners?"

"In the recent coal miners' strike, which extended over a number of months, were you an active partisan on either side, or did you, like the ordinary citizen, take nothing but a passing interest in it?"

"Have you participated in any of the exchange of shots in any of the so-called battles which have occurred in this county during the existence of the strike?"

"Are you desirous of serving on this jury?"

"Have you read any of the literature sent out by the coal companies touching the Zancannelli case?" (Coupled with the offer, which was refused, to show that the coal companies had distributed literature which repeatedly stated, not only that the defendant was guilty, but that he had confessed guilt.)

"I assume, Mr. Moore, that living at Model there, you were not an active participant or partisan one way or another in the industrial struggle?"

"Have you had any part in the industrial conflict here in Colorado at all?"

"Did you act as a deputy sheriff to go out in the armored cars The Colorado Fuel & Iron Company had?"

"Do you know whether or not the coal companies were paying for your services there?" (This to a juror who said he was one of the so-called deputy sheriffs in the battles between miners and company men.)

"Do you know how the sheriff came to summon you, a man who had been in these battles, as a juror in this case?"

"From what you have heard and read of the account of the trial that was had here just a few days ago, do you feel that you know what verdict should have been rendered in the trial?"

"Is it or not true that you would dislike to decide a case contrary to what they" (the coal companies hiring Judge Northcutt to prosecute) "thought it ought to be decided?"

(This to a juror who had said that his business associations with the coal companies would tend to bias him in his verdict, and who none the less was held by the court to be a competent juror when defendant's fifteen challenges had been exhausted. This juror was one of the jurors who, over defendant's protest tried the case!)

"The law is, Mr. Hudson, that at the outset of a trial any defendant in a criminal case is in law presumed to be innocent, and it is the duty of the jurors to give the defendant the benefit of that presumption of law, until, or less, the evidence should show guilt beyond a reasonable doubt. Is your frame of mind such that you can start out on the trial of this cause giving to the defendant the benefit of that rule of law that he shall be presumed to be innocent until the contrary appears beyond a reasonable doubt?"

Some other questions which the court refused to permit defendant to ask of jurors and have the same answered are the following:

Of Juror Pittinger:

"Is not your frame of mind such that you would require this defendant to prove himself to be innocent of the crime?"

"Is it or not true that you now, looking at this defendant, regard him as a guilty man, and is not your frame of mind such that you can in no way give him the benefit of the presumption of innocence at the outset of the trial?"

Of Juror Bramlett:

"Is your frame of mind such that you would require him to prove himself not guilty?"

The court would not permit jurors to answer the following:

"Do you understand what is meant by the presumption of innocence?"

"Do you believe in the doctrine of the presumption of innocence of the defendant?"

"If the evidence to your mind was evenly balanced as to guilt or innocence, which way would your verdict be?"

"Would you hesitate to return a verdict of not guilty if the evidence failed to convince you beyond a reasonable doubt that the man was guilty?"

Further illustrative of what took place in the impaneling of the jury, we note the following:

Juror Cherry, a Trinidad business man, in answer to the questions propounded by the District Attorney, stated that he had an opinion, and that the evidence would have to be clear before he could lay it aside. In answering questions propounded by defendant's counsel he stated that he had "a pretty good idea what the facts are; that it would require clear and convincing evidence to change his mind; that he would start into the trial with that opinion strongly in his mind; that he followed the former trial through the papers with considerable interest; that he had an opinion as to what the verdict should be; that he had a fixed opinion which would have to be changed by very clear evidence, and had an opinion as to who killed Belcher." Thereupon, in response to leading questions by the court, the prospective juror stated that he would decide the case solely on the evidence, and the challenge of defendant was overruled. Upon re-examination the juror stated that he would not lay aside his opinion until he heard clear, strong and convincing evidence to the contrary, and that he had expressed his opinion a number of times. The court then refused to permit inquiry as to bias or prejudice for or against the striking coal miners, or as to whether the juror was an active partisan in the coal strike, or whether he had advocated forcible deportation of the miners. Defendant then asked: "Can you start into the trial presuming defendant to be innocent of any crime?" To this question the juror said: "I object to the question." The court sustained the objection. The defendant then asked of the juror if he were in defendant's place, looking for fair and unbiased jurors, if he would accept a juror who had the same frame of mind as the prospective juror then had. To this the juror replied: "I object," and the court sustained the objection.

In considering these questions, and the action of the court in the premises, and its prejudicial effect upon the defendant's rights, it should be borne in mind that the defendant was a striking coal miner, a member of The United Mine Workers of America, which was conducting, on one side, the industrial conflict, and that the theory of the prosecution was that defendant had committed the murder because deceased was a detective employed by the coal operators, who were conducting the other side of that conflict, and that the killing was done for the "good of the union."

While a person is not necessarily disqualified to serve as a juror in a criminal case, by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused—§ 3691, *et seq.*, R. S. 1908—it would seem always important to ascertain the state of the proposed juror's mind as to the defendant's rights under the law, for, without this, how would it be possible for the court, within the meaning of the law, to be satisfied that the juror has no other interest or motive in the case than to render a true, fair and impartial verdict? However, be that as it may, the defendant had a right to propound questions to the proposed jurors, to show, not only that there existed proper grounds for a challenge for cause, but also to elicit facts to enable him to decide whether or not he would make a peremptory challenge. *Union Pacific Ry. Co. v. Jones,* 21 Colo. 340, 40 Pac. 891. The principle applicable is well stated in *Jones v. The People,* 23 Colo. 276, 280, 47 Pac. 275, 276, in the following language:

"Such questions were proper, not alone for the purpose of informing the parties to the end that they might intelligently exercise their right to challenge for cause, but for the stronger reason that counsel were entitled to be fully informed of the state of mind of the jurors with reference to the matter, in order that the parties should be fully advised in exercising the right of peremptory challenges."

Subsequent developments in the trial demonstrated more clearly the error of the court in excluding answers to the questions propounded by defendant to jurors on their *voir*

*dire.* After the jury had been sworn to try the case, but before any evidence was introduced, or the opening statements made, the defendant presented to the court his verified petition setting forth that further matters touching the qualifications of Juror Burkhart had come to his knowledge, and that of his counsel, since the jury had been sworn, and prayed permission of the court to further interrogate the juror concerning the same. The petition was supported by the affidavit of one Rollins, a barber, a resident of Trinidad, to the effect that while the first trial of defendant, upon the same charge, was in progress, he and Burkhart had made a bet as to the result thereof, which affiant had lost, and paid to Burkhart; that about the 31st of March, 1915, when the second trial of defendant was called, and in which the conviction here involved was secured, affiant and Burkhart had made another bet upon the result of the trial; and that after his second bet was made "the said Juror Burkhart later offered to make another bet with the affiant on the result of the jury trial which is now in progress, and stated to this affiant that if the said Burkhart was accepted as a juror there would be either a hung jury, or a hung Dago," but affiant, having learned from the said Burkhart that he had been summoned as a juror, made no further bet with him. The defendant, upon presenting the petition and affidavit in support thereof, asked the court to permit him to re-examine the juror as to such matters. No counter-evidence or showing was made but the court denied the request, and held that no further examination of the juror could be had. The defendant then made the following separate requests: (1) that he be permitted to inquire of the juror, either in the presence or without the presence of the other jurors, whether or not he had a wager on the trial; (2) that defendant be permitted to introduce evidence showing the truth of the matters alleged in the petition; (3) that defendant be permitted to introduce a challenge to the juror; (4) that issues of fact be made up on the matters and either tried by the court or by triers; (5) that the jury

be discharged; (6) that Juror Burkhart be discharged and another juror called to fill the panel. Each request was denied.

In his motion for a new trial defendant again brought to the attention of the court the aforesaid matter, and the original petition and affidavit were made a part of such motion. The people presented, in opposition to the motion on this point, the affidavit of Juror Burkhart, in which he admitted having made a bet with Rollins upon the result of the first trial of defendant, but denied having made a bet upon the result of the second trial, in the following language:

"Affiant further states that during the second trial of the said cause, and during the selection of the jury, this affiant was summoned on the jury, and that after he was summoned, in passing up the street, and by the shop of the said Rollins, he, the affiant, opened the door and jokingly remarked to the said Rollins, 'Now, I bet you four to one on the result of the Zancannelli jury,' whereupon the said Rollins, in a like spirit, accepted the challenge, and was then and there told in a jesting way by this affiant, that he, the said affiant, was summoned on the jury, and therefore he had the advantage of the said Rollins, or words to that effect, whereupon the said Rollins jestingly responded, 'Well, if you are on the jury, you have the advantage, and all bets are off,' which said remark terminated the conversation of the said Rollins and this affiant, relative to the said bet; that no amount was mentioned, and no money posted, and nothing further said relative thereto."

And in this affidavit Burkhart further says:

"It is true this affiant made some jesting remark about the possibility of there being a 'hung jury or a hung dago,' but said remark was made in mere jest, and not as expressing a wish, opinion or desire of this affiant.

"Affiant at the time had no idea that he would be accepted as a juror in said cause. Affiant did not desire to serve on said jury, but desired more to devote his time and attention to his business, and in addition to his wish of attending

to his work, he felt that his opinion relative to the facts in said cause, was such that he would not be an acceptable juror; that during his *voir dire* examination, he stated all the facts pertaining to his said opinion, which he supposed would exclude him, but in this behalf, affiant's judgment seems to be in error, as he was thereafter accepted on said jury and served on the same."

Upon the hearing of the motion for new trial, the court permitted the defendant to call and examine Burkhart in relation to the matter in question, and he testified in part as follows:

"Q.   You are the same juror who made, on the first trial, a wager or bet with Mr. Rollins?   A.   I am.

Q.   After that trial resulted in a mistrial you called upon Mr. Rollins did you not, and he paid you the amount of money which you won on that bet?   A.   I did.

Q.   After the first trial was over, the trial which resulted in a mis-trial, and prior to the day that you were summoned as a juror, you made another wager with Mr. Rollins, did you not, before you had been summoned as a juror?

A.   I offered to make a wager.   *   *   *

Q.   Well, whatever occurred was before you were summoned as a juror?   A.   Yes, sir.   *   *   *

Q.   The evening before you were summoned as a juror your version of it is that you had this conversation that you would bet him two to one, but that if you should be summoned as a juror the bet was off?   A.   Yes, sir.   *   *   *

Q.   I repeat to see if I understand you correctly?   The conversation occurred the night before you were summoned as a juror, and then you bet him two to one on the result of the verdict, but with the proviso that if you were summoned as a juror that the bet wouldn't go, is that correct?

A.   Yes, sir.   I went on to state at the time that if I was on the jury I would bet him four to one; he says:   'If you are on the jury all bets are off.'   *   *   *

Q.   You stated several times, Mr. Burkhart, that that was before—that is, this second conversation and conditional bet was made before you were summoned on the jury.

I will ask you, if that is correct, why you stated in this affidavit as follows: 'That during the second trial of the said cause, and during the selection of the jury, this affiant was summoned on the jury, and that after he was summoned, in passing up the street, and by the shop of the said Rollins, he, the affiant, opened the door and jokingly remarked to the said Rollins, 'Now I bet you four to one on the result of the Zancannelli jury.' Why did you say it was after you were summoned on the jury in your affidavit, when you stated several times here that it was before you were summoned on the jury and that the bet was conditional?

A.  I don't remember just about what it was, and I don't remember whether it was Wednesday or Thursday or Friday morning I was to appear, I don't remember anything about it; I paid no attention to that or to the wager at all.

Q.  Now Mr. Burkhart, if it was after you were summoned as a juror you wouldn't have made the statement, would you, that it was conditioned?

A.  I didn't make that statement, I say Mr. Rollins made that statement.  I said 'If I am on the jury it will be four to one.'

Q.  Four to one what?  A.  That it would be a hung jury.

Q.  Or what else?  A.  Or a hung dago.  As I say, I paid no attention to it whatever.

Q.  When you made the remark that you would hang the defendant or hang the jury if you were on the jury did you mean it that way?

A.  I wouldn't hang an innocent man, no.

Q.  You called him a dago?  A.  He isn't.

Q.  Did you call him a dago?

A.  That is the remark I made.

Q.  You meant the defendant?  A.  I did."

To appreciate the full force and effect of the disclosures above, it is essential to bear in mind that juror Burkhart had, upon his *voir dire*, said that he had certain business relations with the coal companies said to be interested in the prosecution, and that such relations might embarrass

him in rendering a verdict, and if it appeared that such companies were desirous of prosecuting the cause, or in some way engaged or assisting therein, it might tend to bias or prejudice him, and that he did not feel, because of his business relations with the companies, that he should be required to serve as a juror, and that the court would not permit him to answer the following question propounded by defendant: "Is it not true that you would dislike to decide a case contrary to what they thought it ought to be decided?" or to answer the question: "Can you personally as a juror at the outset of the trial, give to the defendant the benefit of that rule of law" that he shall be presumed to be innocent until the evidence establishes his guilt? and that the juror stated that he had made up his mind that some of the witnesses in the previous trial had testified truthfully, and others untruthfully, and that such opinion still remained with him, and that it would take something more than weak evidence to get him to discard it.

The errors above noted invalidated the proceedings almost at their very beginning. Moreover, the errors are so numerous, so obvious, and so fatal to the validity of the proceedings that unless they were written into the record as they are, under the seal of the trial court, we could not believe that such things had occurred in the trial of a cause in a court of record. The judgment is reversed, and the cause remanded. Mr. Justice Garrigues desires it stated that he concurs in the judgment of reversal on the sole ground that the Attorney General has confessed error.

*Per Curiam: En banc.*