No. 18,024.

LEROY ADOLPH LEICK *v.* PEOPLE OF THE
STATE OF COLORADO.
(322 P. [2d] 674)

Decided January 13, 1958. Rehearing denied March 24, 1958.

538

Mr. CHARLES GINSBERG, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

LEICK was charged with murder, to which he entered pleas of not guilty, and not guilty by reason of insanity at the time of the alleged commission of the offense. Upon trial he was convicted of murder in the first degree and sentenced to death. On writ of error to this Court, the judgment was reversed and the cause remanded for a new trial. *Leick v. People,* 131 Colo. 353, 281 P. (2d) 806.

Following the decision in *Leick v. People,* supra, the statute governing pleas of insanity in criminal cases was materially amended, the amended statute becoming effective eight days after the denial of the petition for rehearing in that case. By reason thereof, Leick was re-

arraigned for the retrial of the charge. He renewed his pleas formerly made, and the record further shows that he entered a plea of insanity since the commission of the alleged crime. Leick was then tried anew, pursuant to the mandate of this Court, on the issues of insanity at the time and not guilty.

The issues of (1) not guilty by reason of insanity at the time of the alleged commission of the crime, and (2) not guilty, were tried in sections before different juries, and in that order. On the first issue the jury returned a verdict finding that Leick "was, on the 1st day of December, 1953, at the time of the alleged commission of the crime, legally sane." On the second issue the jury returned a verdict finding Leick "guilty of first degree murder as charged in the information," and fixed the penalty at death.

After each verdict Leick filed his motion for a new trial; each motion was heard in due course and denied. Following the denial of the motion for new trial filed in connection with the hearing on the issue of "not guilty," the trial court sentenced Leick to death. From the judgment and sentence entered Leick seeks review by writ of error.

As said, trial of these issues was had in two sections, each before a different jury. Accordingly, Leick divides his assignments of error into those charging errors in the proceedings involving the issue of insanity and those involving the issue of not guilty.

In connection with the insanity issue he asserts that the trial court committed prejudicial error in (1) not entering judgment at the conclusion of the trial of that issue, thereby denying him the right of an immediate review; (2) not excusing jurors, on his challenge for cause, who expressed opinions as to Leick's guilt; (3) failing to declare a mistrial when a juror, upon being interrogated as to his qualifications, stated in the presence of other members of the jury panel that Leick was guilty and was so adjudged in a prior trial, notwith-

standing which the Supreme Court reversed the case because of some minor technicality; (4) not allowing a lay witness to express his opinion concerning Leick's insanity; and (5) denying Leick's motion for new trial. Error was also assigned to the reception of the verdict which, it is said, was contrary to the law and evidence.

As to that section of the trial having to do with the issue of not guilty, Leick assigns as error (1) the refusal of the trial court to enter judgment on the verdict finding Leick sane before proceeding with the trial on the issue of not guilty; (2) the admission in evidence of Leick's confession when it was made to appear that he had not been advised of his right to counsel nor warned that such statement might be used against him; (3) the admission in evidence of the confession of Leick's confederate on the ground that the evidence disclosed his partial dissent to the confederate's statements; (4) the submission to the jury of the voluntariness of an admission by Leick "for the reason that said statement to Captain William E. Flor was entire uncorroborated"; (5) the submission to the jury of a form of verdict authorizing the death penalty, on the ground that the evidence at most was circumstantial; and (6) the denial of a motion to instruct the jury to disregard certain statements of the District Attorney made in the course of final argument, the contention being that such statements had no support in the evidence and were highly prejudicial to Leick.

A proper resolution of some phases of this case requires a consideration of parts of the statute relating to pleas of insanity in force when the present case was tried.

The form and manner of pleading insanity in criminal cases are set forth in C.R.S. '53, 39-8-1 and 39-8-3, Cum. Supp. '55, and in C.R.S. '53, 39-8-6. By 39-8-1 it is provided:

"If one of the defenses of the defendant is insanity, it must be pleaded at the same time with other pleas,

unless it is to be the sole plea to the charge. It must be pleaded orally, either by defendant or by his counsel, in the form, 'not guilty by reason of insanity at the time of the alleged commission of the crime.' A defendant who does not thus plead not guilty by reason of insanity shall not be permitted to rely on insanity as a defense to any accusation of crime; provided, however, that evidence of mental condition may be offered in a proper case as bearing upon the capacity of the accused to form the specific intent essential to constitute a crime."

39-8-3 provides for the order of trial of the offense where the insanity plea is joined with other pleas, and reads as follows:

"When a defendant pleads not guilty by reason of insanity at the time of the alleged commission of the crime, and joins with it another plea or pleas not involving insanity, including the plea of not guilty, after the period of observation, the case, in the discretion of the court, may be either set for trial on the insanity issue alone, or may be set for one trial upon all issues raised by all pleas entered; provided, however, that any defendant who has entered a plea of not guilty by reason of insanity shall have the right to a separate trial of that issue upon written demand therefor to be filed in the cause by said defendant or his attorney within twenty days after arraignment. If a defendant shall demand said separate trial on the issue of insanity, or if the court in its discretion shall order a separate trial thereon, the issue of insanity shall be first disposed of by trial to a jury."

39-8-6 details the pleas which may be presented by a defendant who desires to assert insanity at some stage subsequent to the commission of the alleged offense. The pertinent parts of the section are as follows:

"(1) A person charged with the commission of a felony or a misdemeanor who becomes insane after such commission shall not be tried for the offense while his insanity continues. If after verdict of guilty and before

judgment such a defendant becomes and remains insane, no judgment shall be given while the insanity continues. If after judgment and before execution of the sentence such a person becomes and remains insane, then in case the punishment be death, the execution thereof shall be stayed until his recovery from the insanity.

\* \* \*

"(3) In any of these cases the judge of the court in which the criminal charge against such defendant is or has been pending, if he believes the defendant is insane or has a reasonable doubt thereto, of his own motion may impanel a jury to determine by its verdict whether such defendant has thus become and then is insane.

"(4) In any of these cases where it is alleged that the defendant has become thus insane, and such allegation is made in a verified petition filed in the court where the criminal charge is or has been pending, supported by the affidavit of a physician who is a specialist in mental diseases stating as his opinion that the defendant has thus become and is insane, the judge of the court may make such investigation as to the condition of the defendant's mind as in his discretion he deems advisable.

"If after such investigation the judge believes that the defendant has thus become and then is insane, or has a reasonable doubt thereto, with all convenient speed, he must impanel a jury to determine by its verdict whether the defendant has thus become and then is insane."

Should the trial court have entered a judgment on the verdict returned by the jury on the insanity issue? Leick contends that judgment should have been so entered; that the statute refers to a "trial on the insanity issue alone"; that a trial contemplates a conclusion in the form of a judgment; and that the failure to enter a judgment denied him the right to an immediate review in the Supreme Court.

As we view it, this argument does not wash without losing content and color. Under the *procedural* change provided by the statute, permitting a disposition

544

of the insanity issue before the issue of not guilty, the trial is conducted in sections either before the same or a different jury. Together these sections constitute one trial. *People v. Eggers,* 30 Calif. (2d) 676, 185 P. (2d) 1; *Schissler v. State,* 122 Wis. 365, 99 N.W. 593.

█ The action is single. Leick was confronted with one charge. To it he directed two defenses, both of which raised the issue of his culpability. Success on the issue of insanity would have exonerated him of guilt; failure to prevail on that issue left the issue of not guilty for determination, and upon the latter issue he suffered an adverse verdict. On the single charge one judgment only could be entered. Hence, the trial court properly refused to enter judgment on the verdict returned on the issue of insanity.

█ This question of separate trials of the issues before the same or different juries has been raised in other jurisdictions, principally on constitutional grounds. The right to a trial by a jury of twelve, the right to a speedy public trial by an impartial jury, due process, and other constitutional rights have been argued and held not violated, the courts holding generally that the trial of the issues separately results in one trial. See *Schissler v. State,* supra; *People v. Troche,* 206 Calif. 35, 273 Pac. 767; *State v. Toon,* 172 La. 631, 135 So. 7.

Several jurors, in the course of questioning as to their qualifications to sit in the insanity proceedings, stated that they had opinions concerning Leick's guilt. These jurors, however, declared that they had no opinion relating to the issue of insanity, and that they could decide the issue fairly and impartially. Leick challenged these jurors for cause, and the trial court refused to excuse them.

It is quite true that when analyzed as a legal concept, a declaration of belief in the guilt of the accused includes a belief in his mental capacity to commit the crime. A careful scrutiny and study of the interrogation of these jurors and their answers, however, does not remotely

suggest that they so considered their statements. We will not indulge a presumption to that effect.

It is clear from the answers of these jurors to the questions put to them by counsel for both parties that they had no opinions and had expressed none concerning Leick's sanity or insanity, and that they entertained no bias or prejudice against him on the issue of insanity or his plea of insanity, and that they could try him fairly and impartially on that issue. By reason thereof, the trial court properly overruled Leick's challenges for cause. *Shank v. People,* 79 Colo. 576, 247 Pac. 559; *State v. Hoagland,* 39 Ida. 405, 228 Pac. 314; *State v. Olsen,* 88 Kan. 55, 127 Pac. 625; *State v. Hoffman,* 94 Mont. 573, 23 P. (2d) 972; *Tubb v. State,* 55 Tex. Cr. 606, 117 S.W. 858; *Keffer v. State,* 12 Wyo. 49, 73 Pac. 556.

Equally unassailable is the ruling of the trial court when considered in another of its aspects. In the consideration and disposition of challenges for cause the trial court ought to exercise a wise and sound discretion. C.R.S. '53, 78-5-3; *Shank v. People,* supra; *McGonigal v. People,* 74 Colo. 270, 220 Pac. 1003; *Baker v. People,* 72 Colo. 68, 209 Pac. 791. Our concern as a reviewing court extends only to ascertaining whether the trial court exercised such discretion.

Admission that he held an opinion before, or at the time of, the voir dire examination, in the course of which a juror states that he can disregard such opinion, listen to the evidence and apply to it the instructions of the court, and that he can and will be fair and impartial in the trial of the issue, brings into play the trial judge's exercise of this discretion. To believe or not to believe becomes his problem; if the trial judge believes, may we say he erred in believing? May we supersede his determination of fact in this respect?

The proper exercise of this discretion requires the trial judge to determine the competence of the juror to sit in judgment in the case. He hears the questions put to the juror and the answers given, observes the juror's

demeanor while being interrogated, and discerns through the use of his eyes, ears and intelligence wherein truth and credit should be given. The reviewing court does not have the benefit of this personal observation which is so important in judging the credibility of the juror.

We should ever bear in mind the exclusive vantage point of the trial judge in determining the credit and weight which should be given to the juror's statements in the course of the voir dire examination. If the trial judge is persuaded that the juror would fairly and impartially try the issue, his denial of a challenge for cause should not be disturbed, except where it is made to appear that his denial was clearly an abuse of discretion. *Thompson v. People,* 26 Colo. 496, 59 Pac. 51.

No such abuse of discretion emerges from the pages of this record. The trial judge determined *as a fact* the fitness of these jurors to hear and determine the insanity issue.

But beyond this we find an additional determinant which dispels all doubts concerning the qualifications of these jurors. It involves a proper understanding of the plea of not guilty by reason of insanity at the time of the alleged commission of the offense, and a clear comprehension of the manner in which the jurors were interrogated regarding this defense.

It has been held that such a plea is one in the nature of confession and avoidance. *Boyd v. People,* 108 Colo. 289, 116 P. (2d) 193. By asserting it the defendant admits the acts charged, but denies criminal culpability. *State v. Quigley,* 135 Me. 435, 199 Atl. 269. However, such admission extends only and solely to the consideration of such plea; beyond that it has no efficacy in the criminal case.

Notwithstanding such plea of insanity, the presumption of sanity exists at the outset of the hearing, and it is incumbent upon the defendant to generate a reasonable doubt of its existence. *Shank v. People,* supra. But, once he has produced evidence tending to beget a

reasonable doubt, he casts upon the state the obligation of presenting evidence which will satisfy the jury that he was sane beyond a reasonable doubt at the time of the act charged. *Graham v. People,* 95 Colo. 544, 38 P. (2d) 87; *Arridy v. People,* 103 Colo. 29, 82 P. (2d) 757.

From the record before us it clearly appears that interrogation of the jurors proceeded in obvious recognition of the law as thus enunciated. Time and again statements preliminary to questions were made by defense counsel to various jurors evincing this recognition. On one occasion he explained that the issue of insanity called for a determination of Leick's responsibility for "the criminal act of murder"; that "his wife was murdered and he participated in that crime"; *that these were unquestioned facts.* On another, he said: "Now, it is obvious that the defendant had something to do with the death of his wife. In fact, there is a direct responsibility for that death, *excepting for the circumstances of his mental condition."* On still another, defense counsel stated: "There will be the appearance of the defendant on the stand himself to tell what he did and let you judge him and judge his actions, his conduct and mentality."

These statements are typical of many made by defense counsel to jurors as groundwork for questioning them concerning their qualifications to sit as triers of the facts. They were made within the framework of a plea in the nature of confession and avoidance. Quite naturally, such a plea, thus presented, evoked opinions concerning *the act* while professedly it left the minds of the jurors free to consider fairly and impartially the *culpability of the actor.*

And such is likely to be the case in any situation involving the *confession* of conduct which the jurors instinctively censure, but the *avoidance* of which the juror states he can and will decide fairly and impartially pursuant to the instructions of the court, and upon the evidence produced to establish such avoidance.

 From any of the three approaches made to this assignment of error, we arrive at the same conclusion. We hold that the answers made by these jurors to the questions propounded to them, touching their competency to hear and determine the issue of insanity, were not disqualifying.

In response to questioning by the trial court and Leick's attorney, a juror stated, in the presence of other members of the panel, that the guilt of the defendant had been fully established in the previous trial, but that the Supreme Court had reversed the case on a minor technicality. The trial court thereupon excused such juror for cause.

Thereafter the following proceedings took place:

"Mr. Ginsberg: I would like at this time to request the Court to admonish the jury on the previous juror's expressions that the defendant's case was reversed in the Supreme Court on a minor technicality. I think the Jury ought to be instructed to disregard that statement by the juror — that the actions of our Supreme Court is never predicated upon minor technicalities, but on the law. I think the Jury should be admonished at this time.

"Mr. Keating: *We have no objection, if the Court please, to the request by counsel.* May we remind counsel that when he is questioning the jury it is up to him to control the answers. We have no right to get up and to object to any questions that he is elliciting [sic] from the jury. *We think it is proper that the remarks made by the juror be disregarded.*

"The Court: Ladies and Gentlemen, first of all I think it should be known that there is a definite presumption of the intelligence of you Ladies and Gentlemen who have been placed in this box as prospective jurors [sic]. The remarks as made by the juror who was excused is definitely his personal opinion. I don't believe that you should pay any attention to it at all, if it [sic] had any effect upon you.

*"You will disregard anything that he had to say relative to this matter, please.*

"Mr. Ginsberg: I am going to move at this time for a mistrial." (Emphasis supplied.)

The trial judge and counsel then retired to chambers where the motion was argued at length, after which the judge denied it. Was this ruling erroneous?

 These statements were not prejudicial to Leick. If they had a tendency to prejudice the other members of the panel against Leick, the action of court and counsel removed it. Besides, the prejudicial effect of such statement, if any, related only to the issue of not guilty, an issue not then before these jurors. And it must be borne in mind that these jurors were required to meet only the test of qualification on the issue of insanity, as shown above.

Moreover, the trial court promptly and correctly directed the jurors to disregard these statements, and it "is presumed that the jury followed the court's instruction." *Bauman v. People,* 130 Colo. 248, 274 P. (2d) 591. Whether a mistrial should be declared rests in the sound discretion of the trial court. "[I]n the absence of abuse of discretion its ruling thereon will not be disturbed on review." *Routa v. People,* 117 Colo. 564, 192 P. (2d) 436. We find no error in the denial of the motion for mistrial.

Leick called as a witness a clergyman who testified that he had not known the defendant until he visited him for the first time "soon after he was incarcerated in the County Jail in Denver." Thereafter, he saw Leick "about once a week," remaining with him "approximately half an hour at a time." While Leick was in the penitentiary he "talked to him three or four times."

 He further testified that he had observed Leick during these visits, and that he had reached an opinion as to his mentality, whereupon he was asked the question, "Will you state as a layman what your opinion is as to his ability to distinguish between right and wrong?" The objection that the witness was not competent to

testify for lack of a proper foundation to establish qualification was sustained.

No offer of proof was made, and for aught we know the witness might have testified adversely to Leick. Such offer should have been made. *Brown v. People,* 120 Colo. 493, 210 P. (2d) 837. "The decision of the court on this point cannot be reviewed, since no offer was made in the court below to prove the fact sought to be elicited by the interrogatory." *Ford v. State,* 46 Nebr. 390, 64 N.W. 1082.

It is to be noted that the testimony is obscure on the nearness in time after the event that the clergyman first became acquainted with Leick, nor did the question, as framed, relate to his mental condition at the time of the event. Assuming the question referred to the time of the tragedy, what is the law which applies to the circumstances here narrated?

 This court is committed to the rule that "one who, in the opinion of the trial court, shows adequate means of becoming acquainted with the person whose mental condition is in issue, *after detailing the facts and circumstances concerning his acquaintance and the acts and conversation upon which his conclusion is based,* may give his opinion on the question of sanity. The weight of that opinion is for the jury." *Turley v. People,* 73 Colo. 518, 216 Pac. 536; *Smith v. People,* 120 Colo. 39, 206 P. (2d) 826.

 This rule has been subjected to much criticism. See Wigmore on Evidence (3rd Ed.), Sections 1933, et seq. Regardless of the propriety of the criticisms levelled against it, the rule certainly should apply to the non-expert who would state an opinion of a mental state at a certain time, based upon an acquaintanceship postdating such time. *Smith v. People,* supra. See *State v. Douglas,* 312 Mo. 373, 278 S.W. 1016; *Shults v. State,* 37 Nebr. 481, 55 N.W. 1080; *Stewart v. Manship,* 193 Ind. 694, 140 N.E. 543. Furthermore, the opinion of such non-expert is admissible only when it is made to appear that his ac-

quaintanceship with the defendant had the requisite nearness in time after the act in issue which would properly move the sound discretion of the court to receive it. *McGonigal v. People,* supra. The exclusion of a lay opinion formed by observation commenced more than three months after the transaction in question was held not to be an abuse of discretion. *McGonigal v. People,* supra.

Unfortunately, the record does not show with any degree of definiteness the time at which the clergyman began his observations of Leick. Nevertheless, we are inclined to believe that it was greatly less than three months. Not having, however, detailed the facts and circumstances — the acts, conduct and conversations upon which his conclusion would be based — the trial court had no other recourse than to follow the law as enunciated in decisions of this court. The exclusion of the lay opinion was proper.

We have carefully reviewed the trial of the insanity issue. A number of psychiatrists testified that Leick was sane at the time of the act in issue. The defendant testified in his own behalf, and detailed the events which occurred prior to and on December 1, 1953. Whether the scheme to kill his wife, and the execution thereof, revealed a mental aberration which would remove responsibility, was for the jury to determine. A psychiatrist called by Leick gave his complete analysis of why he considered Leick insane on the day in question. Other witnesses who were acquainted with Leick testified to incidents prior to the killing which the jury could consider on the question of mental fitness.

The legal problems arising in the course of the trial of the issue of insanity have been scrupulously studied. From a review of the record and an analysis of the law, we are convinced that the motion for new trial on this issue was properly denied. We find nothing in the record to warrant us in holding that the verdict of the jury finding defendant sane at the time of the alleged com-

mission of the offense was contrary to the law and the evidence.

In passing to the not guilty issue, we need not discuss further the first assignment: That the trial court should have entered judgment on the verdict on the issue of insanity before proceeding with the trial on the issue of not guilty. What we have already said on this question disposes of this assignment of error.

It is argued that the police officers should have advised Leick of his right to counsel and warned him that any statement he made might be used against him before taking his confession. Undoubtedly, warning a suspect that his statement may be used against him is the better and safer practice. Criminal Evidence, Melville, page 56. 22 C.J.S., §822, page 1442.

A person charged with a crime is only entitled to counsel to appear for him and aid him in his defense (Art. II, Section 16, Constitution of Colorado; C.R.S. '53, 39-7-29 and 39-7-31), "and not to save him from his voluntary acts." *State v. Bunk,* 4 N.J. 461, 73 Atl. (2d) 249, 19 A.L.R. (2d) 1316. The right to be represented by counsel of his own choosing is not involved here.

Both questions are answered in the case of *Cahill v. People,* 111 Colo. 29, 137 P. (2d) 673, one by direct statement and the other by clear inference:

"Considering these contentions categorically, it is well established that a confession voluntarily made is not invalidated or made inadmissible in evidence by reason of the failure of the officers to inform the defendant that his confession might be used against him.

\* \* \*

"The fact that defendant was in custody at the time he made the statement, in itself, does not render the evidence incompetent (Reagan v. People, supra), nor is evidence of a confession 'rendered inadmissible merely by the fact that it was obtained during an undue delay between arrest and the time when accused was brought before the court; by the fact that when it was made per-

sons in authority were present * * *, or that he was not represented by counsel * * * or because of other similar factors.' 22 C.J.S., p. 1431, §817."

See *Sukle v. People,* 109 Colo. 363, 125 P. (2d) 151.

There being no right in one being thus questioned to have the police advise him that he may have counsel and there being no duty to warn him that any statement made by him may be used against him, it becomes obvious that error assigned on those grounds is without merit.

Leick and his confederate Dukes were questioned separately and then together. Both signed written statements which were substantially alike in content except for the detail of who actually choked Mrs. Leick. Each charged the other with taking her life, and each accused the other of lying in respect to the matter; otherwise they were in agreement as to the events preceding, at the time of, and after the strangling of Mrs. Leick.

When it was sought to introduce Dukes' confession in evidence, Leick objected on the ground that on the "vital question * * *, who did the killing of Evelyn Leick, there is a complete and utter difference between Dukes' and this defendant's statements shown by Exhibits Y and Z." In admitting Dukes' confession the court ordered the disputed detail deleted, and as thus expurgated it was submitted to the jury for its consideration. This ruling forms the basis of an assignment of error.

"Even if a suspect makes a confession or statement implicating other persons present, it is inadmissible as against them *unless they have heard and assented to it,* or unless, in the opinion of the court, the circumstances are such as to show that the others intended to commit themselves by their silence." (Emphasis supplied.) Criminal Evidence, Melville, page 62. Since no assent was given to the whole, are the undisputed parts of Dukes' confession thereby rendered inadmissible?

Intimation of admissibility appears in the decision of

*Cowles v. People,* 107 Colo. 161, 110 P. (2d) 249. A clear holding of admissibility is contained in *Moeller v. People,* 70 Colo. 223, 199 Pac. 414, and *People v. Lehne,* 359 Ill. 631, 195 N.E. 468. In the latter case the circumstances surrounding the taking of statements were very similar to·those in the present case. It was said in that case wherein both defendants were being tried:

"The statement of·Lehne, in so far as it was denied by Mrs. Puhse, was not read to the jury; those parts included within the brackets above being suppressed by the court. It is our opinion that when Lehne completed the dictation of his statement, doing it, as he did, directly from the face of and in answer to the statement of Mrs. Puhse, it became as deleted, competent evidence as against both of them."

We find no error in the admission of Dukes' statement with the disputed detail expunged so that the jury had before it only those portions to which Leick assented.

·The next assignment requires a quotation of the testimony of the witness Flor, a detective who was in charge of the interrogation of Leick and Dukes. Because, as asserted, it was "entirely uncorroborated," Leick contends its admission is reversible error.

Flor testified that he talked to Leick after he signed the confession. In this conversation Leick advised Flor that all he had told him in the written statement was not true, and that he would not give a full story of what occurred. Thereupon, the conversation between Leick and Flor shifted to Dukes' statement by Flor asking "if all the story was true —"

"Q. What story was true? A. All Dukes' story was true. Q. All right. A. He said it was true, except that Dukes actually killed Evelyn — Q. Just a moment, Captain. A. — while he was driving away from the apartment. Q. Handing you again People's Exhibit Z, I believe you identified that as a statement of Gene Dukes, is that correct? A. Yes. Q. And you said that Dukes' statement was true except that Dukes had killed Evelyn.

Is that the statement that you and he were talking about? A. Yes. This statement here."

In Leick's brief the position is taken that this is an uncorroborated admission without which "there is no direct evidence whatever as to how Evelyn Leick came to her death." According to Leick's signed statement he did not know if he was present when Evelyn was choked to death. Dukes, in his signed statement, said that Leick killed her. This portion of Dukes' statement was suppressed, and is not part of the evidence in this case.

But both signed statements were in accord in recounting the plan of Leick and Dukes for accomplishing Evelyn's death; the motivation for the killing; the acts of Leick and Dukes in the execution of the plan up to the point of the actual slaying; and their removal of her apparently lifeless body from the front seat of the car to the rear thereof.

The car used for the perpetration of the scheme was driven by Leick. Pursuant to their plot the car was parked at the rear of the apartment house in which the Leicks lived, with Dukes hidden in the rear of the car. Leick, his wife and her sister climbed into the front seat, and seated themselves in that order, with Leick behind the wheel. After the car was started Dukes raised up and stated, "This is a stick-up." He then struck the sister with an iron bar, and she was flung from the car. The car left this scene with three persons in it: Leick behind the wheel, his wife, and Dukes. As to these details both signed statements agree.

The physical evidence shows distinct markings on the throat of Evelyn; the city pathologist gave it as his opinion that Mrs. Leick died from asphyxiation by strangulation. Photographs taken after the car was found indicate that a struggle took place therein. Other photographs show the rear of the car with Mrs. Leick lying on the floor with her head to the rear of where the driver would be seated.

All these circumstances were corroborative of the ad-

mission; they belie the argument that Leick's verbal statement to Flor "was entirely uncorroborated." That being the case, the premise of Leick's assignment of error is without content.

Since we are not certain of the real meaning of this assignment, we will consider another element of it. Leick maintains that the trial court "erred in submitting to the jury the determination as to whether or not a verbal statement made to Captain William E. Flor was a voluntary admission on the part of the Plaintiff in Error, for the reason that said statement to Captain William E. Flor was entirely uncorroborated."

 Attempted exculpatory or mitigatory matter appears in this conversation between Flor and Leick. Leick advised Flor that all he had said in his signed statement was not true, and further asserted that Dukes, and not he, killed Evelyn. That the exculpatory or mitigatory matter was ineffectual, it making no difference under the circumstances of this case who actually strangled her, does not make inapplicable the rule that a statement containing exculpation is admissible in evidence without first establishing its voluntariness. *Bruner v. People,* supra; *Walker v. People,* 126 Colo. 135, 248 P. (2d) 287.

 An involuntary inculpating admission "should be excluded by the court." *Martinez v. People,* 55 Colo. 51, 132 Pac. 64, Ann. Cas. 1914 C 559. But an admission is not rendered involuntary because it is "uncorroborated." "[A]lways the finding of 'involuntary' rests upon something which, time, place, circumstances, or individual considered, would be equivalent to some measure of compulsion." *Rogers v. People,* 104 Colo. 594, 94 P. (2d) 453.

 As has been shown, the admission was supported by other evidence in the case. An admission by the accused, when corroborated by other evidence, may be sufficient to sustain a conviction. *King v. People,* 7 Colo. 224, 3 Pac. 223. See *Opper v. U.S.,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101.

Whatever approach is made to this assignment brings us to the view that it finds no support in the authorities. In trying to understand it and make it meaningful, we have probably unduly discussed the point.

The above facts and circumstances are also necessary to the determination of the last two assignments of error. It is contended that the evidence was wholly circumstantial; and hence, the trial court should not have permitted the jury to decide whether the death penalty should be imposed.

 Under the facts and circumstances of this case it makes no difference whether Leick or Dukes actually choked Mrs. Leick to death. *Cook v. People,* 60 Colo. 263, 153 Pac. 214. Both were principals. *Griffin v. People,* 44 Colo. 533, 99 Pac. 321; *Newton v. People,* 96 Colo. 246, 41 P. (2d) 300. They planned her death; they participated in the execution of the plan; there is the statement of Leick, made to Flor, that Dukes actually killed Evelyn while he (Leick) was driving away from the apartment. In view of all the evidence in the case, the two signed statements, and the verbal statement made to Flor, sufficient direct evidence appears to sustain the death penalty. *Moya v. People,* 88 Colo. 139, 293 Pac. 335.

In view of the evidence as outlined above, was the District Attorney justified in saying to the jury in his closing argument:

"Yes, many stories are told here of the version of who did what. Only three people, ladies and gentlemen, knew what happened on December 1, 1953, and that was Leick, his associate, and Evelyn Leick, and her lips are sealed in death. We'll never know what happened, but it must have been like a bolt of lightning when she finally discovered that the man she loved was killing her. And this was even during the pleasure planned by the defendant Leick, and I say to you, ladies and gentlemen, that the fingers on the hands that throttled the life out of that twenty-six-year old girl are in this courtroom,

the fingers on the hands of Leick he so placidly holds."

Leick contends that the evidence is devoid of any facts upon which such a statement could be made; consequently, the trial court committed error in refusing to instruct the jury to disregard the statement.

As we have said, it makes no difference in the accountability of Leick in this case whether he or Dukes, or both together, strangled Mrs. Leick. The facts disclosed by the photographs, some showing her body in the rear of the car with her head back of the driver's seat, and a photograph of her body showing injuries to her throat and legs, could produce the inference that Leick choked her while Dukes pinned her legs down. That Dukes handled her legs when they transferred her body to the back of the car strengthens this inference; that Leick was the driver, and her head was behind the driver's seat in the rear of the car after the transfer, makes probable the inference.

A clear statement of the rule is set forth in 23 C.J.S. 546, §1093, as follows:

"It is within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and if he does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Counsel may draw and state to the jury his own conclusions from the law and the testimony, provided he does not misstate the testimony, nor state facts as to which there is no testimony."

This disposes of the assignments of error upon which Leick depended for a reversal. In none is there error. A reading and study of 4057 folios of record reveal two points, one of which was vigorously argued before the trial court, and both of which, though not made the basis of asserted error, prompt comment from us. We believe this is in the best tradition of the law, that one subject

to the death penalty shall have his case considered in all its important phases.

During the argument to the jury on the trial of the insanity issue the District Attorney read a partial transcript of the testimony. Objection was made to the use of this transcription on the ground that it gave undue emphasis to such evidence.

There may be some danger in this practice in that a jury may be induced to accept as bearing absolute accuracy and verity that testimony which has been transcribed by the court reporter. But that danger was not present in this case because, as presented to the jury, the District Attorney carefully refrained from stating that he was reading from the reporter's transcript. *Richardson v. State*, 21 Ala.' App. 639, 111 So. 202.

The applicable rule is thus stated in *Lakey v. State*, 258 Ala. 116, 61 So. (2d) 117:

"Frankly, we do not perceive that ordinarily a defendant could be prejudiced by an attorney presenting to the jury with accuracy the testimony of a witness rather than trusting to the inaccuracy of human recollection. Usually, it could but promote justice if the triers of fact understand and remember with accuracy the evidence upon which the case must rest, whether their recollection be refreshed by a memorandum made by the attorney or by the correctly transcribed notes of the court reporter, the truth being what the parties seek after. The average solicitor with customary eloquence could emphasize the evidence to greater effect and influence the jury more to the State's advantage by garnishing the facts from his own recollection than by reading the cold transcription of the testimony."

When any part of a reporter's transcript is resorted to in argument, and such is made known to the jury, it would seem to be the better practice for the trial court to admonish the jury that the transcript is not an official certification of the truth of the testimony tran-

scribed, but merely attests the accuracy of the transcription.

We next consider the record proper as it reveals that Leick entered a plea of not guilty by reason of insanity at the time of the alleged offense and since. The attempt to aver insanity subsequent to the alleged offense was ineffectual because not in compliance with the applicable statute. *Mundy v. People,* 105 Colo. 547, 100 P. (2d) 584.

C.R.S. '53, 39-8-6, quoted in pertinent part above, requires that a plea of insanity arising at some stage subsequent to the alleged offense be by verified petition, and that the petition be supported by the "affidavit of a physician who is a specialist in mental diseases stating as his opinion that the defendant has thus become and is insane . . .," and that the same be filed in the case. None of these requirements was followed in this case.

It is important to note that the statute further provides that the trial court may on its own motion, where it entertains a reasonable doubt of the defendant's sanity, impanel a jury to have determination thereof. Notwithstanding the failure to plead such insanity in accordance with the statute, we indulge the presumption that the trial court would have acted pursuant to its authority under the statute had it entertained at the time or thereafter a reasonable doubt of Leick's sanity.

An insane person may not be tried for a crime, nor may he be sentenced where his insanity occurs and continues after the return of a verdict, nor may he be executed where insanity occurs and continues after the sentence of death has been imposed. In any of these cases recovery removes the statutory impediment, and the regular course of the law takes up at the point where the insanity arose.

No proper plea of insanity relating to any time subsequent to the alleged offense having been lodged, and nothing appearing in the record which would require us to say that the trial court should have moved

in the matter, we find regularity in these proceedings. Nothing said herein forecloses resorting to the remedy afforded by the insanity statute where insanity may exist at this time. A verified petition of present insanity, supported by the affidavit of a psychiatrist, filed in the case would initiate such proceeding.

A review of the whole record induces us to say that Leick received a fair trial. The judgment should be and is hereby affirmed, and it is ordered that the judgment be executed during the week of May 5, 1958.

MR. JUSTICE HOLLAND, MR. JUSTICE SUTTON and MR. JUSTICE DAY dissent.

MR. JUSTICE HOLLAND dissenting.

It must first be remembered that this is a capital case and defendant is now under a death sentence.

The statement of the facts and the procedure is well set out in the majority opinion. Since I herewith present what in my opinion should be the opinion of this court, I will content myself with a few observations of the majority opinion. On the question of whether or not the trial court should have entered a judgment on the verdict returned by the jury on the insanity issue, the majority opinion states:

"As we view it, such argument will not wash without losing content or color. Under the *procedural* change, permitting a disposition of the insanity issue before the not guilty issue, the trial is conducted in sections either before the same or a different jury. Together these sections constitute one trial. *People v. Eggers,* 30 Calif. (2d) 676, 185 P. (2d) 1; *Schissler v. State,* 122 Wis. 365, 99 N.W. 593."

It is hard to conceive of a more prejudicial situation than to have the various material features of a criminal case tried in segments before *different* juries and then to sum up the entire matter, it is called *one* trial. It is bad enough to have two separate trials before one and

the same jury. If the jury first found that the defendant is sane, such finding, according to human nature, would have much to do with the question of guilt or innocence of the crime charged in a juror's mind. This does not take into consideration the possibility of error in the sanity trial. If this condition could obtain where only one jury is involved, what could be the lurking possibilities if a second jury was involved in the trial of the other issue. There is no doubt in my mind but what judgment should be entered on the sanity hearing, thereby enabling defendant to have an immediate review before facing the hazard of a trial on the main issue.

It is stated in the majority opinion, in reference to the plea of not guilty by reason of insanity at the time of the commission of the alleged offense, that:

"Notwithstanding such plea of insanity, the presumption of sanity exists at the outset of the hearing, and it is incumbent upon the defendant to generate a reasonable doubt of its existence. *Shank v. People,* supra." Why should defendant be called upon to generate a reasonable doubt when a judgment on the sanity question would be conclusive?

In the majority opinion, in a discussion of whether or not the trial court should have granted the motion for a mistrial, growing out of the interrogation of jurors on voir dire, it is stated:

"These statements were not prejudicial to Leick. If they had a tendency to prejudice the other members of the panel against Leick, the action of court and counsel removed it. Besides the prejudicial effect of such statement, if any, related only to the issue of not guilty, an issue not before these jurors."

Remembering that this is a capital case and to say, "If they had a tendency to prejudice the other members of the panel against Leick, the action of court and counsel removed it," is but to venture on the thin ice of prejudice.

I cannot agree with the following statement of the

majority opinion: "A person charged with a crime is only entitled to counsel to appear for him and aid him in his defense * * * and not to save him from his voluntary acts." This statement has reference to the contention of defendant that the police officers should have advised defendant of his right to counsel and warned him that any statements he might make would be used against him, before taking his confession. The majority opinion also states: "Undoubtedly warning a suspect that his statement may be used against him is the better and safer practice." If it is recognized as a better and a safer practice, then the defendant in a capital case is entitled to that "safer practice." It is the function of counsel to see if the confession was truly voluntary and to determine whether defendant, being in the hands of authorities, was in possession of his faculties and not under pressure, threats or promises.

In the majority opinion it is stated:

"There being no right in one being thus questioned to have the police advise him that he may have counsel and there being no duty to warn him that his statement may be used against him, it becomes obvious that error assigned on those grounds is without merit."

I wonder about the predicament had defendant called for counsel in face of the statement that one being questioned has no right to have counsel.

In the matter of the circumstance of the district attorney, during argument to the jury on the insanity issue, reading a partial transcript of the testimony: Objection was made to the use of this transcript on the ground that it gave undue emphasis to such evidence. I think this objection is good, and I believe the majority opinion recognizes some merit in the objection, because the majority opinion later says there may be some danger in this practice in that a jury may be induced to accept as bearing absolute accuracy and verity to that testimony which has been transcribed by the court reporter. Whether or not it was revealed that it was a transcript

564

as it was read by the prosecuting official would certainly emphasize the danger.

The remainder of this dissenting opinion is a copy of my original opinion herein, which did not have the approval of the majority of the court.

As reported in *Leick v. People,* 131 Colo. 353, 281 P. (2d) 806, plaintiff in error has been before this court on a charge of first degree murder. The first case of conviction was, on March 31, 1955, reversed and the cause remanded for a new trial on all issues raised by the plea of not guilty and a separate plea of not guilty by reason of insanity at the time of the alleged commission of the crime. Such new trial was had beginning on November 28, 1955, at which time the separate trial on the question of sanity was begun by the voir dire examination of the jury panel as to their qualifications to sit as jurors on the sanity hearing, at the conclusion of which the jury, duly empaneled, returned its verdict finding defendant sane at the time of the commission of the alleged offense. Trial then proceeded on the offense as charged in the information on defendant's plea of not guilty, resulting in a jury verdict of guilty as charged in the information, and the penalty was fixed at death.

If defendant had a fair and impartial trial at the sanity hearing, then we would enter into a review of the trial proper on the murder charge; however, we are inclined to the view that error obtained in the sanity hearing, which, of course, must first be determined, because the sanity or insanity of defendant, if not controlling, is material in the prosecution and defense of the main charge.

Defendant is a confessed murderer, or at least an accessory before and during the act; however, if, upon a sanity trial without error, he was found to be insane, then in the eyes of the law, no crime by this defendant has been committed. Our system of jurisprudence requires that there be a fair and impartial trial upon all

phases of a charge. Insanity was and is a pleaded defense herein to the murder charge.

As is permissible in criminal cases, defendant has filed an assignment of errors including both the sanity hearing and the murder trial. The assignment contains ten specified claims of error in the sanity trial. Without passing upon the merit or demerit of each assignment in the sanity hearing, I believe that the motion for a new trial, which fully presented all of the alleged errors to the trial court, should have been granted, because a possibility of error as presented in all of the various assignments existed, and as made up from an over-all picture, it is disclosed that defendant did not have a fair and impartial trial in its true sense. In considering the many phases of this case involving the sanity hearing and the murder trial, it should not be overlooked that defendant in either or both trials is entitled to the benefit of any doubt, which always follows in a criminal proceeding. Viewed from any angle, defendant in the sanity hearing is clothed with these safeguards, because the plea of insanity is the only defense and is inseparable from the procedure to be followed on the criminal charge.

Counsel for defendant contends, as a first assignment of error, that the court erred in not entering judgment in the sanity proceedings, and there being no judgment there is nothing properly before this court for review. Regardless of the possible merit of this contention, defendant is not prejudiced thereby, because defendant is here with an exhaustive presentation of the errors in the sanity hearing, which this court is now about to determine.

Since there is an inseparable relation between this hearing and the murder trial, we believe the trial court erroneously curtailed counsel for defendant's voir dire examination of prospective jurors, and there is a possibility that prospective jurors attending upon the panel were prejudiced from hearing the examination of jurors

called to the stand on the voir dire examination and the rulings of the court on questions presented and objections made thereto. Counsel for defendant, in attempting to elicit information from prospective jurors who were called in order that he might make more intelligent challenges, attempted to inquire of jurors if they knew defendant was charged with murder and if they had formed or expressed any opinion as to defendant's guilt on the murder charge which would affect their qualifications to sit as jurors in the sanity hearing.

The objections of the District Attorney to the line of questioning may generally be summed up from the following excerpt of the record:

"As I say, we have no objections to his finding out the frame of the mind that this Jury may be in because of something they read or heard about the case, or anything else in connection with that.

\* \* \*

"But, we do say that insanity is an element of murder and they are called upon to decide whether or not he is guilty of one of the elements of murder. I say that that is wrong.

\* \* \*

"There can be only one verdict in this case. That is the sanity or insanity. It has nothing to do with the next trial."

The trial court then ruled on the objections in the following language:

"The Court having been fully advised by counsel on both sides, it is the ruling of this Court that counsel for the defense may inquire into the state of mind as best he can of these prospective jurors and can advise them that there has been a charge of murder.

"However, the objection is sustained that the sanity case is one of the parts of the murder trial."

We fail to follow the reasoning of the district attorney and the trial court in this matter, because the verdict in the sanity trial has everything to do with the trial of the

murder charge, because, although the jury in that case is not bound by the verdict of the sanity trial, it certainly would be persuasive, and the ruling of the trial court to the effect that the sanity case is not one of the parts of the murder trial was and is prejudicial error. This court has determined that the issue involved in a sanity trial is not a collateral matter, but is a substantive defense to the criminal charge of murder. *Beckstead v. People*, 133 Colo. 72, 292 P. (2d) 189.

It seemed to be the position of the district attorney that a juror who condemned defendant as being guilty of murder was still qualified to sit as a juror in the sanity hearing. This presents a strange situation, because the juror has expressed himself as believing the defendant guilty of the murder charge against which insanity is the only defense. It runs counter to human experience to believe that any juror who believed the defendant guilty of murder was in any sense qualified to try defendant on the issue of insanity, which was the only defense to the murder charge.

The statement made by a juror in the presence of the other jurors already in the jury box, and in the presence of the entire panel, that defendant was guilty and that the supreme court had reversed the case on a minor technicality, was sufficient to sustain a motion for a mistrial; however, the admonition of the trial court was only to disregard anything the juror had to say relative to that matter, and, as an admonition, was ineffectual.

When the entire record is considered, together with the limitations placed upon counsel for defendant, the statements of the district attorney, and the expressions of the court in making its rulings, the over-all picture is such that it is highly probable that the atmosphere was charged with prejudice against defendant, resulting in his not having a fair and impartial trial on the sanity hearing.

As a further supplement to the errors herein indicated, the trial court refused to permit a lay witness to

express an opinion as to the sanity of defendant. This occurred when a minister was called as a witness for defendant and testified that he had visited defendant at least once a week after his confinement in jail and visited with him for at least one-half hour on each occasion. When asked his opinion, objection was made and the court sustained the objection on the ground that the witness had not been qualified as a lay witness to give an opinion. It may be supposed at this point, that while the court was exercising its discretion in the matter, it likely abused that discretion when defendant is entitled to the benefit of all reasonable doubts; and further, the qualifications of this witness could have been explored by cross-examination. The objection to any answer that the witness might have made is on the ground that it would be simply a conclusion and not supported by facts. Objections that such proposed testimony states a conclusion only are sometimes pushed to captious extremes. *McCarthy v. Anaconda Copper Co.,* 70 Mont. 309, 225 Pac. 391. It is reasonable to assume that the witness, a minister of the gospel, by virtue of his education was qualified to formulate an opinion that would be trustworthy. The jury was entitled to weigh and consider the witness's opinion for what it was worth. The real question here went to the weight of testimony and not to its admissibility. This witness, from his many visits and conversations with defendant, formed an opinion just as any juror might have done. He was not allowed to express that opinion. Under the circumstances, it is quite unlikely, but he might have stated that he believed defendant to be sane. He should have been allowed, giving defendant full benefit, to have expressed his opinion, and, if, on cross-examination, he was unable to fortify that opinion by facts, circumstances, happenings, or expressions of defendant, then it was for the jury to weigh that unfortified opinion and determine its value. Sanity or insanity is not always established by expert witnesses. It is well established that other witnesses

who are not experts or professional men may give their opinion or relate their personal observation of the person whose mental condition is in question so far as those observations tend to throw light upon that position. 20 Am. Jur., page 643, §771. It was shown that the witness here had adequate opportunity to observe the speech, manner, habits and conduct of defendant. He should have been allowed to give his opinion on the issue of insanity and the weight of such opinion could have been developed by further examination or tested by cross-examination. "The weight and force of the testimony will depend upon the extent of the opportunity, as well as the power and habits of observation possessed by the witness, and a consideration of all the circumstances under which an opinion was formed. The courts do not undertake to lay down the definite rule as to how closely the witness must have observed the person whose sanity is the subject of inquiry in order to be qualified as a witness, *as even a casual observer* may discover mental manifestations that would make his testimony valuable. Whether there is a fair basis for an opinion by a witness must be left largely to the trial court, and the jury taking note of the opportunity and powers of observation of the witness, must then decide what weight and effect shall be given to his opinion. *Kempf, et al. v. Koppa,* 85 Pac. 806.

It cannot be said that the absence of the testimony of this witness, which might have been favorable to defendant, was not the difference between the question of life imprisonment or death in arriving at the verdict.

For the reasons herein presented, it is my opinion that the cause should be remanded to the trial court for another trial on the plea of not guilty by reason of insanity at the time of the alleged commission of the offense, since a fair and impartial trial on that issue may well determine the outcome of the murder charge.

It is my opinion that the judgment or verdict on the insanity plea and trial should be reversed, and if, upon

another insanity hearing, defendant is found to be sane at the time of the commission of the crime, then the issues in that case stand submitted in this court for determination.

Mr. Justice Sutton dissenting.

I dissent for the primary reason that the record discloses this to be one of those cases where a strict adherence to the form of the law by the trial court has hidden its true substance which guarantees each defendant a fair trial. Conducting the insanity hearing phase of a murder trial in an atmosphere charged with tension because of a defendant's admitted participation in the crime and prior erroneous conviction thereof is not conducive to due process of law.

It is clear that Leick was compelled to exercise peremptory challenges during the selection of the jury against several jurors whom the trial court should have excused for cause. The thirteenth juror, who was one not discharged for cause, and yet not subject to a peremptory challenge because no more existed, was excused before the jury began its deliberation.

A reading of the record relating to jurors challenged for cause reveals that some jurors who were up to then disqualified due to their answers were pressed with leading questions and thorough interrogation to finally give the answers desired by the state to qualify them. Trial courts have a rather wide latitude in such examinations and we do not lightly set aside their rulings in such matters; however, here I believe that considering the record as a whole the trial court abused its discretion in this case.

For example, the thirteenth juror stated in reply to a question that she would decide the issue of insanity by the number of psychiatrists who testified on each side because she felt they knew more about it than she did. After further questioning she stated she would fairly

and impartially decide the case upon all the evidence and according to the court's instructions. In spite of this juror's change of heart under prodding a quotation from 112 A.L.R. 534 is appropropriate here:

"And where in a murder trial the defense relied upon was insanity of the defendant at the time of the killing, it was held that such defendant did not obtain the impartial jury to which he was entitled where one of the jurors, on his examination, expressed his determination to give weight to no evidence of defendant's insanity except that of a physician, but such juror was nevertheless held qualified over the defendant's challenge for cause. *Territory v. Lum Dim* (1917) 23 Haw. 792."

The interrogation of juror Corbett is representative of several of those where the challenge for cause was denied. The pertinent parts are:

"Q. Mr. Corbett, you have heard the questions that I have directed to the other jurors for the purpose of trying to get a fair and impartial jury in this case. I will ask you whether you heard the facts with respect to the murder that is involved in this matter? A. Yes. Q. Have you read about it? A. Yes, I have. Q. At the time it occurred, I suppose? A. Yes. Q. Did you from that, form a conviction of your own as to — or did you form an attitude against this defendant? A. In all honesty I would say 'Yes.' Q. You did form one? A. Yes. Q. It would be rather difficult for you to remove that? A. I think it would. Q. Challenge the juror for cause.

"Mr. Keating: If the Court please, we resist the Challenge. We don't know what counsel is seeking — as to whether or not Mr. Corbett has any opinion as to the sanity or insanity of the defendant on December 1st.

"The Court: Mr. Corbett, do you feel that you could sit here and hear the evidence as adduced from this witness stand and any exhibits that may be introduced; taking that evidence along with the law and instructions given by this Court; and fairly and impartially deter-

mine the sanity or insanity of this defendant? A. I think I could.

"Mr. Keating: We resist the Challenge.

"Mr. Ginsberg: I will question the juror a little further.

"The Court: Proceed, Mr. Ginsberg.

"Q. (By Mr. Ginsberg), You say you would find some difficulty in removing the opinion that you now have? A. Yes, sir. Q. You are not certain that it could be removed. You are not certain that it could be removed? A. No. Not at this time, I am not certain. Q. At this time you are not certain of that—that it can be removed? A. No, sir. Q. That conviction carries with it a prejudice against the defendant, does it not? A. No. Q. I mean a feeling against him — not a prejudice, necessarily, but your feelings against the death for the acts that he committed? A. No, I don't carry any feelings against the defendant at this time. Q. Pardon me? A. I don't carry any feelings against the defendant at this time. Q. But the opinion that you hold is one prejudicial to him — the opinion that you say would have to be removed; is that one that is prejudicial to the defendant? A. Not to him, no, sir. Q. Pardon me. A. Not to him personally. Q. I don't mean that you have any personal malice against him, but you have personal convictions affecting him, have you not? A. Yes. Q. It affects this defendant. It isn't anything personal on your part. You have the right to your conviction. You have a right to your opinion. I am not quarreling with you. All that we are attempting to do is to get a fair and impartial jury. * * * But, in your present mental attitude you have a feeling that affects this defendant and your opinion of him, is that right? A. Yes, sir. Q. You are not certain that that can be removed? A. Not at this time, no. Q. I repeat the Challenge for cause."

Similar attention to the juror Mr. McFarland reveals the following questions and answers:

"Q. Do you have any pre-conceived notions of his

guilt? A. I believe that has already been established. Q. Do you think that has been established? A. Yes. Q. Well you condemn one that has been established of having committed murder, don't you? A. That is right. Q. That feeling exists in your mind, does it not? A. Yes, sir, it does. Q. You definitely have the feeling of condemnation in your mind against this defendant as far as his guilt is concerned? A. Yes, sir."

Thereupon a challenge was made for cause which was denied by the court. With the jurors Corbett and McFarland already on record as indicated by the above questioning and answering, the juror Mr. Traylor made the following statement in open court:

"A. I would like to state my position. I feel that the man had been tried and found guilty. Because of a minor technicality, I understand that that decision was thrown out and the trial is to be resumed, as I see it now; and, that we are in the first phase of determining whether the man was sane or insane at the time of the crime. I must in my own mind feel that if we declare the man is sane, that he will go onto trial again. I believe that is correct in the present setup, but I must in my own mind know what is going on to be the result of my decision in order to answer the question that you are going to ask me. Now, if he is adjudged insane, I know in my own mind what will ultimately — if he is found guilty again happen to him. In other words, we are basically determining the mode of punishment. That is how I feel here. Now, the man is guilty, when he was declared guilty; but found not guilty or something on a technicality. If the man is guilty — if he is sane or insane — is immaterial to me."

The majority opinion then details how the court excused Mr. Traylor, instructed the jury to disregard his remarks and denied defendant's motion for a mistrial as a result of what under these facts was a prejudicial statement. This is mentioned here to point up the atmosphere in which the trial was held.

Questions and answers similar in character to those asked witness Corbett are revealed in the interrogation of the juror Walkup. She was the thirteenth juror. The defendant was not able to eliminate her from the jury either through his challenge for cause or the exercise of his peremptory challenge.

Among the questions and answers to the juror Mrs. Wyatt were the following: Q. You in your own mind think his guilt has been fixed? A. Yes, sir. Q. That would involve the sanity too, and that was fixed? A. I have no opinion about his sanity at all."

During the first part of the examination the trial court admonished Leick's counsel concerning his attempts to question the prospective jurors concerning their belief in the guilt of the defendant, saying that was not in issue, that the sole issue was whether defendant was insane at the time of the offense charged. Counsel protested this and the court did not always thereafter strictly enforce its ruling so we cannot know how restrictive it may have been to the voir dire examination desired. There exists, however, the possibility that at least some of the jurors who were chosen did not have their beliefs on guilt properly explored.

The objections of the District Attorney to this line of questioning may generally be summed up from the following excerpts of the record:

"As I say, we have no objections to his finding out the frame of the mind that this Jury may be in because of something they read or heard about the case, or anything else in connection with that.

"But, we do say that insanity is an element of murder and they are called upon to decide whether or not he is guilty of one of the elements of murder. I say that that is wrong.

"There can be only one verdict in this case. That is the sanity or insanity. It has nothing to do with the next trial."

The trial court then ruled on the objections in the following language:

"The Court having been fully advised by counsel on both sides, it is the ruling of this Court that counsel for the defense may inquire into the state òf mind as best he can of these prospective jurors and can advise them that there has been a charge of murder. However, the objection is sustained that the sanity case is one of the parts of the murder trial."

I agree with Mr. Justice Holland when he says he fails to follow the reasoning of the district attorney and the trial court in this matter, because the verdict in the sanity trial has everything to do with the trial of the murder charge, because, although the jury in that case is not bound by the verdict of the sanity trial, it certainly would be persuasive, and the ruling of the trial court to the effect that the sanity case is not one of the parts of the murder trial was and is prejudicial error. This court has determined that the issue involved in a sanity trial is not a collateral matter, but is a substantive defense to the criminal charge of murder. *Beckstead v. People*, 133 Colo. 72, 292 P. (2d) 189.

Only recently we reversed a conviction for murder partly on the grounds that the minds of the jury had or could have been inflamed by certain of the state's exhibits as well as remarks of the prosecutor. *Archina v. People,* 135 Colo. 8, 307 P. (2d) 1083. Here is a different version of the same problem with the voir dire examinations revealing the same danger to the defendant.

We held in *Zancannelli v. People* (1917), 63 Colo. 252, 165 Pac. 612, that a defendant has the right to interrogate prospective jurors regarding their expressed opinions concerning the guilt of the accused, because denial of such a right would prevent a defendant from determining whether there exist grounds for challenge for cause or reasons for making a peremptory challenge. The rule is not different just because thè first defense alleged is not guilty by reason of insanity.

We now have the question to determine whether this defendant was denied due process of law under the Fourteenth Amendment to the Federal Constitution and under Article II, §3, of the Colorado Constitution because of the denial of several of his challenges for cause and the attempt by the trial court to limit the voir dire examination.

What is due process depends on circumstances varying with the subject matter and the necessities of the situation. 12 Am. Jur. 263, Sec. 570. It clearly includes all the steps essential to deprive a person of life, liberty, or property, and all the forms and acts essential to its application and to give it effect. "Process" is the mode by which the purpose of the law may be effected. "Law" as used in the guaranty embraces all the legal and equitable rules defining human rights and duties and providing for their enforcement, not only as between man and man, but also between the state and its citizens. 12 Am. Jur. 265, §571.

In the case at issue we must consider the circumstances, subject matter and necessities. Here the first two principles are that the court had a defendant for trial who had once before, with admitted widespread publicity, been tried, found guilty and ordered executed for murder. His defenses there were the same as here. In both trials he admitted at least planning and participation in the crime. The necessities are that society to protect itself from the actions of such persons must have laws which though firm, nevertheless protect each accused in his constitutional rights. A successful defense of insanity at the time of the commission of an act results in law as though the act had not been committed.

In the *Zancannelli* case supra the record is considerably more replete with prejudice of jurors than here; however, the court ably points out there that it was error for the trial court to rule out as improper "* * * substantially every question propounded by the defense to elicit the condition of the mind of the jurors respect-

ing the defendant * * *." There in a murder case we also had examinations on voir dire of proposed jurors who held opinions concerning the guilt or innocence of the defendant; these were in part based upon newspaper articles and the jurors stated that notwithstanding such opinions they could give the defendant a fair and impartial trial according to the law as it should be given to them by the court under the evidence submitted in the case.

Here the majority has held, and I agree, that the proceedings actually are one trial even though the defense of insanity is tried first. The fact that it is only one trial with one judgment means that whether a prospective juror has an opinion as to the defendant's guilt or innocence is a material matter which must be held to be within the scope of reasonable examination by the defense.

Many times it is difficult to empanel a proper jury where as here the air is charged with tension against the act of murder and with the knowledge of the participation of the accused in a crime. The widespread newspaper, radio and other publicity, however, must not preclude a defendant from having jurors whom, the entire record discloses, lack conscious or unconscious prejudice. Here a consideration of the record shows that there were one or more jurors serving, or for whom challenges for cause were denied, who had expressed opinions which could have affected the outcome of the hearing.

Defendant has advanced an erroneous concept that in Colorado a juror is automatically subject to removal by a challenge for cause because of an opinion of the guilt or possibly of the innocence of a defendant. C.R.S. '53, 78-5-3. Also see *Thompson v. People*, 26 Colo. 496, 505, 59 Pac. 51 and *Bowers* on *"Judicial Discretion of Trial Courts,"* p. 341, et seq. §303, 304, 305.

C.R.S. '53, 78-5-3 provides:

"No person summoned as a juror in a criminal case shall be disqualified to serve as such by reason of a

previously formed or expressed opinion with reference to the guilt or innocence of the accused; provided, the court shall be satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict, according to the law and the evidence submitted to the jury in the trial of such cause."

This statute has been in effect since 1872 and has been sustained or commented upon in many cases from *Solander v. People,* (1873), 2 Colo. 48, through *McGonigal v. People,* (1923), 74 Colo. 270, 220 Pac. 1003. Assuming its constitutionality under modern conditions it nevertheless can occur thereunder, as happened here, that the court in exercising its discretion unwittingly abused it. Here the abuse arose because the court, though excusing some jurors did sustain the state as against the defendant on other jurors when their examinations showed there could have been proper grounds for excuse. Such a succession of rulings against the defendant certainly did not give him the benefit of any doubts and discloses a frame of mind prejudicial to him. Undoubtedly the trial court was led to its conclusions on each such contested juror because he felt and had stated that the defendant's guilt had nothing to do with this trial. I have already pointed out that this was error. The issue was what was framed by the defendant's plea of *not guilty* by reason of insanity.

In the absence of a statute the modern rule unquestionably is that formation of an opinion suffices to disqualify a juror. 31 Am. Jur. 665, §145. Also, a juror who has an opinion in a case, and whose declaration that he could render an impartial verdict is qualified by a doubt, is incompetent; such declaration must be unequivocal and absolute, 31 Am. Jur. 667, §148. Some courts have taken the view that the constitutional right to a jury trial is not to be impaired by compelling parties to take chances with a juror who has formed an impression or preconceived opinion, irrespective of how fairly and conscientiously he believes that he can act impartially in

the matter, in the light of the evidence introduced. A juror who has formed an opinion, it has been said, cannot be impartial. 31 Am. Jur. 667-668, §148.

We point out that in the instant case there was conflicting evidence as to whether defendant was insane as alleged. We cannot usurp the jury's function to determine which evidence was in the preponderance. We can point out though that a jury selected without full right to examine as to opinions held, coupled with a concept that guilt of the crime had no bearing on the insanity issue, could easily not give proper weight to the evidence. A defendant does not have to run that risk even under our statute. The discretion of the trial court is almost complete in this matter but all doubts must be resolved in favor of the defendant, not the state. The recent civil case of *Burke v. Poindexter*, (Okla. 1957) 313 P. (2d) 1090, is in point here. The question there was primarily whether some jurors who had sat on a previous case for damages against the same defendant were proper jurors in a different action by a new plaintiff. The court there said in reversing the cause for a new trial:

"Due regard to careful protection of the rights of litigants, which should actuate trial courts, requires that they scrupulously confine the proceedings wherein these rights are to be settled, within recognized boundaries providing for determination by impartial trials. * * *

"Recognition by this court of the general rule, relative to the trial court's discretion in determining the competency of jurors, may be observed in *Meier v. Edsall*, 192 Okla. 529, 137 P. 2d 926. However, recognition of the rule decrees necessity for examination of the trial court's action to determine if there has been an abuse of discretion.

"* * * A trial court's discretion to do, or to refuse to do something, in certain instances is a legal discretion, to be exercised in accordance with fixed principles of law. The term (judicial discretion) is the subject of

many definitions, though generally recognized as being synonymous with judicial power. In *Kidd v. Commonwealth*, 255 Ky. 42, 74 S.W. 2d 944, 'Judicial Discretion' was said to be an impartial discretion, guided and controlled by fixed legal principles; a discretion to be exercised in conformity with the spirit of the law (an equitable decision as to what is proper and just under the law) and in a manner to subserve and not defeat the substantial ends of justice. * * *

"Examination of this record discloses the trial court assumed to exercise judicial discretion by determining the competency of the challenged jurors solely upon the basis that from their own testimony that they considered themselves able to render an impartial verdict. And, this was done without reference to other known factors, or equitable considerations as to what was just and proper under the circumstances.

"We are of the opinion the trial court erred in holding, over defendant's objection, that all of the challenged jurors who sat in previous trial involving the same questions of fact, were competent to sit in the present case, particularly when it appeared upon examination that certain of such jurors had preconceived opinions which could have only been removed, if at all, by the introduction of evidence."

Other errors urged by the defendant appear to be without merit and I concur with the majority opinion thereon.

I would reverse the judgment with directions to grant a new trial as to the defense of insanity at the time of the alleged offense and a trial on the defense of insanity since the alleged offense if defendant makes a proper showing therefor.

Mr. Justice Day states that he concurs in this dissent.